# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

THE CITY OF GARY,　　　　　　　)
　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　　　CAUSE NO.: 2:07-CV-56-PRC
　　　　　　　　　　　　　　　　　)
PAUL SHAFER d/b/a PAUL'S AUTO　)
YARD, and PAUL'S AUTO YARD, INC.,　)
　　　　　　　Defendants.　　　　　)

## OPINION AND ORDER

This matter is before the Court on Defendants Paul Shafer and Paul's Auto Yard, Inc.'s Motion for Summary Judgment [DE 69], filed by Defendants on February 17, 2009, and a Defendants' Motion to Bar the Testimony of Plaintiff's Expert Jay Vandeven Pursuant to F.R.E. 702 and Daubert [DE 82], filed by Defendants on March 27, 2009.  For the following reasons, the Court hereby **DENIES** the Defendants Paul Shafer and Paul's Auto Yard, Inc.'s Motion for Summary Judgment [DE 69] and also **DENIES** the Defendants' Motion to Bar the Testimony of Plaintiff's Expert Jay Vandeven Pursuant to F.R.E. 702 and Daubert [DE 82].

## PROCEDURAL BACKGROUND

On February 26, 2007, Plaintiff City of Gary filed its Complaint for Damages, alleging that Paul Shafer, doing business as Paul's Auto Yard, and Paul's Auto Yard, Inc. ("Defendants"), polluted a business lot located at 2124 Colfax Street, Gary, Indiana ("the Property"), in violation of sections 107 and 113 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"); Indiana's Environmental Legal Action Statute, Indiana Code § 13-30-9-2; and the Gary Environmental Ordinance section 95.204.  Plaintiff also alleged that Defendants are liable

under Indiana nuisance law, codified at Indiana Code § 32-30-6-7, for: (i) releasing hazardous substances onto the Property; (ii) wrongfully injuring the City's Property; and (iii) interfering with the City's use and enjoyment of the Property.

Plaintiff also asserts that it is entitled to recover direct and consequential damages for the alleged nuisance. Plaintiff further contends that pursuant to CERCLA § 113 and Gary Environmental Ordinance section 95.204, it is entitled to contribution based on costs expended and those that will be expended in investigating and remediating the hazardous substances at the Property.

On April 30, 2007, Defendants filed their Answer to the Complaint, as well as a Motion for Partial Summary Judgment on Count Three of Plaintiff's Complaint (which alleges that the Defendants are liable to Plaintiff pursuant to Ordinance section 95.204) and Motions to Dismiss the City of Gary's Count Five nuisance and Count Six CERCLA § 113 claims, with supporting briefs.

On October 4, 2007, the Court issued an Opinion and Order granting Defendants' Motion for Partial Summary Judgment as to the claim under Ordinance section 95.204 and also issued an Opinion and Order granting the Motions to Dismiss Counts Five and Six of the Complaint. Accordingly, the claims remaining before the Court are the CERCLA § 107 claim (Count I), the Indiana Environmental Legal Action claim (Count II), and the claim for declaratory relief (Count IV).

On August 29, 2008, Plaintiff disclosed the expert report of Jay Vandeven, entitled Affidavit of Jay Vandeven. On October 31, 2008, Defendants disclosed two expert reports of Geoffrey A. Glanders. On December 1, 2008, Plaintiff disclosed the Rebuttal Expert Report of Jay Vandeven.

On February 17, 2009, Defendants filed a Motion for Summary Judgment on the remaining

claims and a memorandum in support. Plaintiff filed a response brief on March 23, 2009, with the Declaration of Jay Vandeven as an attachment, to which Defendants filed a reply brief on April 6, 2009.

On March 27, 2009, Defendants filed a Motion to Bar the Testimony of Plaintiff's Expert Jay Vandeven Pursuant to Federal Rule of Evidence 702 and Daubert along with a memorandum in support. Plaintiff filed a response brief in opposition on April 16, 2009, to which Defendants filed a reply brief on April 29, 2009.

On April 9, 2009, Defendants filed a Motion to Strike Reports of Plaintiff's Expert, seeking to strike the Rebuttal Expert Report and Declaration of Jay Vandeven. On May 13, 2009, the Court issued an Opinion and Order denying the Motion to Strike Reports of Plaintiff's Expert.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## FACTS

The City of Gary is a political subdivision of the State of Indiana, located in Lake County. Defendants operated an automobile salvage and scrap yard at the Property from approximately 1980 until 1991.

The Property is a tract of land divided into two parcels with one parcel located on the west side of Colfax Street and the other located on the east side. The Property is located within the J-Pit redevelopment area, which includes residential, commercial, industrial, and undeveloped land. The J-Pit area is divided into five sections, with the west parcel being comprised of Section 2. Adjacent

properties include the City of Gary Landfill to the north of the Property, and a former sand mine called the J-Pit.

From approximately 1950 until his death in 1978, LeRoy Shafer operated LeRoy's Auto Yard on the western parcel of the Property, exclusively on Section 2. LeRoy Shafer's operations involved selling approximately between 400 and 1,200 cars for scrap per year. According to Defendant Paul Shafer's March 13, 2008 deposition testimony, LeRoy Shafer's operations involved turning cars on their side and poking a hole in the gas tank and drive shaft to drain out gasoline prior to burning the cars.[1]

Once Defendants took over operations on the Property, they operated on Section 3 (east of Colfax Street) and on the eastern quarter of Section 2 (west of Colfax Street). Defendants' operations on the Property involved storage, recycling, and disposal of wrecked automobiles and automobile parts. Defendants' business records indicate that between approximately 10,000 and 25,000 cars per year were brought onto the Property during Defendants' operations. According to Defendants, they removed batteries and gasoline from vehicles immediately upon their arrival at the Property and then kept the batteries in a locked trailer with a metal floor, with the fluids being collected and stored in containers. According to Defendants, batteries were removed from the vehicles to prevent trespassers from driving the cars on the Property or from stealing the vehicles. Mr. Shafer testified at his deposition that these things happened often.

In 1991, Defendants sold the Property to Waste Management of Indiana, LLC ("Waste Management"), and, as part of the sale, Defendants were required to level the Property. Waste Management did not conduct any business operations on the Property and sold it to Plaintiff in 1998.

---

[1] According to Defendants, based on the expert report of Geoffrey A. Glanders, during LeRoy's operations, batteries were left in cars and occasionally cracked and leaked on Section 2 land.

Once Plaintiff received the Property, it conducted an environmental investigation to determine its condition. The investigation revealed lead and metals in the soil at levels that exceeded the Indiana Department of Environmental Management's ("IDEM") cleanup regulations. Plaintiff entered into Indiana's Voluntary Remediation Program and signed a Voluntary Remediation Agreement on February 15, 2002, and a revised version on July 29, 2008. Further site investigation activities in 2004, performed by Baker Environmental, Inc. ("Baker"), included a soil analysis that revealed levels of lead as high as 3,200 mg/kg, exceeding the IDEM cleanup regulations. Following the investigations, Plaintiff concluded that Defendants were responsible for contaminating the Property.

## ANALYSIS

### A. Motion to Bar Expert Testimony of Mr. Vandeven

As a preliminary matter, in their reply brief, Defendants argue that Plaintiff cannot rely on Mr. Vandeven's Rebuttal Expert Report to support the admissibility of his testimony. Rather, Defendants seek to limit Plaintiff and the Court to a narrow review of the record consisting of solely the initial expert report and Mr. Vandeven's October 23, 2008 deposition testimony. In support, Defendants argue that rebuttal opinions are not part of Plaintiff's case in chief and cannot be used to determine if Mr. Vandeven's testimony is admissible.

However, in its May 13, 2009 Order on Defendants' Motion to Strike Reports of Plaintiff's Expert, this Court rejected similar arguments made by Defendants as being unsupported by case law. The Court found that the opinions expressed in the Rebuttal Expert Report did not constitute new opinions. Defendants have failed to offer any legal support that the Court may not review the

rebuttal report as part of its inquiry into the admissibility of Mr. Vandeven's opinions. Therefore, the Court declines to limit itself to a narrow review of the record, as Defendants propose, for purposes of determining the admissibility of Mr. Vandeven's testimony. *See Wright v. Stern*, 450 F. Supp. 2d 335, 361-62 (S.D.N.Y. 2006) (reviewing rebuttal report, that reached the same conclusions as the expert's initial report, in determining whether to exclude the expert's testimony).

As part of the initial expert report of Jay Vandeven, entitled Affidavit of Jay Vandeven, Mr. Vandeven offered the two following opinions which Defendants now move to bar:

> 18. The contamination present on the Paul's Auto Yard site, namely lead, is attributable to and consistent with historical wrecking yard operations conducted on the property. Based on the records available and review of aerial photographs, the contamination of the eastern side of Colfax is related to Paul Shafer's operations between 1980 and 1991. There are no records available for Leroy Shafer's operations on the western side of Colfax. However, the records available for the years 1987 through 1991 indicate that operations were significantly greater during Paul Shafer's ownership and operation and, therefore, contamination on the western side of Colfax is also largely the result of Paul Shafer's operations.

> 19. An appropriate remedial option to address the impacted soils at the Paul's Auto Yard site, including a combination of excavation and capping, would cost approximately $5,000,000 . . .

Pl.'s Mem. Opp. to Defs.' Mot. to Bar Test. Pl.'s Expert, Ex. 1, ¶¶ 18-19.

In the instant Motion, Defendants argue that the Court should bar the testimony of Mr. Vandeven related to causation (¶ 18) and damages (¶ 19). The Court addresses each in turn.

**STANDARD**

The admissibility of expert evidence is governed by Federal Rule of Evidence 702 as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, *and* (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (emphasis added). Here, Mr. Vandeven's qualifications in the field of environmental engineering are not at issue.

The admissibility of expert testimony–whether based on "scientific," "technical," or "other specialized" knowledge–is governed by the Supreme Court's general holding in *Daubert*, which requires the district court to exercise a "gatekeeping" function to ensure that such testimony is both reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *see generally Daubert*, 509 U.S. at 589-92; *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). The fundamental purpose of this gate-keeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. In considering *Daubert* and *Kumho Tire*, the Seventh Circuit has endorsed a two-step analysis for the district courts to use in evaluating expert testimony under Rule 702: first, the court must determine whether the expert's testimony is "reliable," and second, the court must determine whether the

expert's testimony is "relevant." *See, e.g., United States v. Hall*, 165 F.3d 1095, 1101-02 (7th Cir.1999); *Cummins v. Lyle Industries*, 93 F.3d 362, 367 (7th Cir.1996); *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614-16 (7th Cir.1993); *accord Kumho Tire*, 526 U.S. at 141.

For an expert opinion to satisfy the reliability requirement, the expert must be qualified in the relevant field and the expert's opinion must be based on sound scientific or other relevant methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Generally, the expert witness must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the witness's field. *Kumho*, 526 U.S. at 152. Specifically, a court may, but is not required to, consider a nonexclusive list of four factors in assessing reliability: (1) whether the expert's theories and techniques can be verified by the scientific method through testing; (2) whether the theories and techniques have been subjected to peer review and publication; (3) whether the theories and techniques have been evaluated for their potential rate of error; and (4) whether the theories and techniques have been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The advisory committee notes to Rule 702 provide additional factors, along with the *Daubert* list, for a court to consider, including, but not limited to, "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed.R.Evid. 702 advisory committee notes (2000 Amendments) (citations omitted). In *Kumho Tire*, the Court articulated that strict adherence to the factors was not necessary; rather, the factors are examples of criteria that a trial court may use to determine whether the expert, in offering the opinion, acted as would an expert in the field. *Kumho Tire*, 526 U.S. at 151-52. As a result, "the *Daubert* framework is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered." *Mihailovich v. Laatsch*, 359 F.3d 892, 919 (7th Cir. 2004). Ultimately, the object of the

court's Rule 702 reliability inquiry is to ensure that the opinions expressed by testifying experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

Finally, the Court notes that "[a] review of caselaw [sic] after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702 advisory committee notes (2000 Amendments). Further, the District Court possesses "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. Further, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Comer v. American Elec. Power*, 63 F. Supp. 2d 927, 933 (N.D. Ind. 1999) (quoting *Kumho Tire*, 526 U.S. at 142 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997))).

*1. Mr. Vandeven's opinion that Defendants contributed to the contamination on the Property*

Defendants argue that Mr. Vandeven's opinion that Defendants contributed to the lead contamination at the Property should be barred because it is not reliable or relevant. The Court will address each argument in turn.

a. Reliability

In their memorandum in support of the Motion to Bar Mr. Vandeven's Testimony, Defendants argue that Mr. Vandeven's opinion is unreliable because his conclusion that Defendants contributed to the lead contamination on the Property is based solely upon a review of aerial

photographs and counting automobiles[2] and constitutes a conclusion rather than a scientific opinion. In particular, Defendants argue that Mr. Vandeven failed to conduct an evaluation and investigation that would result in a reliable opinion because he: failed to identify a source of release (except for batteries); did not speak with any witnesses regarding LeRoy Shafer's operations[3] and flooding by the Gary Landfill; failed to consider the Landfill's history of flooding; ignored testimony of former employees and eyewitnesses that there were no signs of spills or releases during Defendants' operations; and ignored the fact that illegal dumping occurred on the Property after Defendants' operations, all resulting in Mr. Vandeven failing to consider and exclude the Gary Landfill, LeRoy Shafer, and illegal dumping as alternative sources of contamination.

First, contrary to Defendants' assertions that Mr. Vandeven merely reviewed aerial photographs and counted cars in developing his opinion that Defendants' operations contributed to the lead contamination on the Property, Plaintiff argues that Mr. Vandeven's opinion was based on a review of several rounds of sampling results from the Property and surrounding properties, review of agency records/reports, environmental site assessments, EPA guidelines, deposition testimony, and Defendants' business records along with aerial photographs of the Property. Based on a review of these documents, Plaintiff argues, Mr. Vandeven developed his opinion. After reviewing the record, the Court finds that Mr. Vandeven's methodology is valid.

While Defendants are correct that Mr. Vandeven identified at his October 23, 2008 deposition that he reviewed aerial photographs and the deposition of Mr. Shafer, the record does not

---

[2] In their reply brief, Defendants argue that at his October 23, 2008 deposition, when asked what he relied on in forming his opinion, Mr. Vandeven only identified aerial photographs and the deposition testimony of Defendant Paul Shafer.

[3] Particularly, spills that occurred on the Property because of LeRoy's practice of puncturing gas tanks and batteries.

support that Mr. Vandeven solely relied on these two sources of information. Rather, Mr. Vandeven testified at that same deposition that he reviewed other documents, including the Baker Phase II and Remedial Alternatives Work Plan and accounting records prior to the deposition. Further, in Mr. Vandeven's Rebuttal Expert Report, in support of his opinion that Defendants' operations contributed to the contamination, Mr. Vandeven largely discusses his review of: soil samples from the Property and surrounding properties, compiled by Baker during the Phase II Environmental Site Assessment, indicating that lead concentrations on the Property were of a magnitude higher than those found on surrounding properties; IDEM Inspection reports on the Property; deposition testimony; USEPA documents; Defendants' business records; and aerial photographs, among other documents. Accordingly, Defendants' assertion that Mr. Vandeven solely reviewed aerial photographs and counted automobiles is unsupported by the record. Defendants do not address, or challenge, Mr. Vandeven's review of the sources identified and discussed in the Rebuttal Expert Report. Nonetheless, the Court must still determine whether Mr. Vandeven's methodology is valid.

An expert's opinion should not be rejected as unreliable simply because the expert relied on the reports of others. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000). Rather, experts may rely on data and other information that is supplied by third parties. *Nutrasweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000). "Analyzing data assembled by others is neither illicit nor unusual, even if the data were prepared for litigation by an interested party." *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007). "Either 'hands-on testing' or 'review of experimental, statistical, or other scientific data generated by others in the field' may suffice as a reasonable methodology upon which to base an opinion." *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999). Therefore, Mr. Vandeven's review of sample analysis and

agency reports, as well as review of aerial photographs, was a valid methodology that legitimately led to his conclusion that Defendants' operations were the likely source of lead contamination.[4] *See Nutrasweet*, 227 F.3d at 788 (finding review of aerial photographs in conjunction with other reliable methodology as reliable).

Next, Defendants argue that Mr. Vandeven's opinion is unreliable because he failed to address or ignored certain evidence, resulting in his alleged failure to address and exclude the Gary Landfill, LeRoy Shafer's operations, and illegal dumping as alternative sources of contamination. In response, Plaintiff argues that Mr. Vandeven adequately accounted for alternative explanations. An expert's conclusion "should not be excluded because he or she has failed to rule out *every* possible alternative cause." *Troutner v. Marten Transp., LTD.*, No. 2:05-CV-40-PRC, 2006 WL 3523542, at *4 (N.D. Ind. Dec. 5, 2006) (emphasis in original). Instead, so long as an expert offers some explanation why the alternative causes could not be the sole cause, the expert's failure to address alternative causes affects the weight the jury should give the evidence, not its admissibility. *Id.*

After reviewing the record, the Court concludes that Mr. Vandeven "adequately accounted" for alternative explanations when concluding that Defendants' operations contributed to the lead contamination on the Property. First, in his Rebuttal Expert Report, Mr. Vandeven specifically addressed whether the Landfill was a possible source of lead contamination and concluded that there was a lack of evidence of source material and a pathway for transport of lead to the Property. In

---

[4] Further, Mr. Vandeven had extensive experience in working as an environmental engineer, has been involved in the study and remediation of hundreds of contaminated properties, and has managed the investigation and remediation of numerous CERCLA National Priorities Lists sites. Given his expertise in the field of environmental engineering, it was permissible for him to review the information provided to him by others in formulating his opinion. *See Southwire*, 528 F. Supp. 2d at 934 (finding that an expert with extensive experience in his field permissibly assessed information provided by others in formulating his opinion).

arriving at this conclusion, Mr. Vandeven evaluated surface water samples collected from the Landfill, groundwater conditions on the Property, soil data from the Property and surrounding areas, including areas affected by flooding and runoff from the Landfill, and the absence of conditions necessary for runoff from the Landfill to be a major source of lead contamination at the Property. Based on this information, Mr. Vandeven concluded that the Landfill could not be a significant source of lead at the Property. Therefore, the Court finds that Mr. Vandeven adequately accounted for the Landfill and explained why he excluded it as an alternative source of contamination.

Second, in his Rebuttal Expert Report, Mr. Vandeven addressed LeRoy Shafer's operations on the Property as a possible source of contamination. In particular, Mr. Vandeven noted that records supported that LeRoy Shafer operated exclusively on Section 2 of the Property, the size of the Property was four times larger during Defendant Paul Shafer's operations and included Section 3, and Defendant Paul Shafer's operations were more extensive than LeRoy's–processing approximately twenty times the number of cars that LeRoy did during his operation. Yet, the pattern of lead contamination across Section 2 and Section 3, where LeRoy did not operate, was consistent, even though operations on Section 2 occurred for twice as long as Paul Shafer's operations on Section 3. Accordingly, the record supports that Mr. Vandeven's opinion adequately accounted for LeRoy Shafer's operations as being an alternative source of contamination and adequately explained why he excluded this source.

Third, in the Rebuttal Expert Report, Mr. Vandeven addresses illegal dumping at the Property after 1993 and specifically discussed his opinion of the lack of evidence that any of the materials that may have been illegally dumped contained lead. Mr. Vandeven specifically provided that it did not appear that any of the illegally dumped materials were analyzed for their chemical

composition and there was no evidence of those materials containing lead. Accordingly, Mr. Vandeven adequately accounted for the illegal dumping as a possible alternative source of contamination and discounted it. Therefore, Mr. Vandeven's opinion adequately accounted for the three alternative sources identified by Defendants and concluded that Defendants operations were likely the primary source of lead contamination.

Further, with regard to the evidence that Mr. Vandeven allegedly ignored or failed to take into account, "questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility." *Loeffel Steel Prods., Inc., v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005). Although it does not relate to admissibility, the Court will nonetheless address Defendants' arguments. Defendants allege that Mr. Vandeven failed to identify a time of release and failed to provide a mechanism or source of release. However, Mr. Vandeven's opinion repeatedly identifies that the lead contamination occurred during Defendants' operations on the Property and identifies batteries,[5] leaded gasoline, and grading as sources of release. Further, Mr. Vandeven's alleged failure to consider testimony regarding the absence of spills/releases, speak with employees of LeRoy,[6] and whether Mr. Vandeven was unaware of flooding from the Landfill, numerous IDEM violations for the Landfill, runoff, and illegal disposal all go toward Mr. Vandeven's alleged failure to address and exclude alternative

---

[5] Although Defendants argue that batteries could not be a source of release because they were removed from the vehicles upon arrival and were stored at a trailer, Mr. Vandeven identified evidence that he interpreted as indicating that batteries were left in the vehicles, as discussed more fully below in regard to the Motion for Summary Judgment.

[6] Defendants also argue that Mr. Vandeven should have spoken with neighbors and former employees of LeRoy Shafer, especially since he testified at his October 23, 2008 deposition that speaking with witnesses, if they are available, is an accepted practice in his field. Nonetheless, an expert's decision to use one form of scientific methodology over another goes to the expert's credibility rather than the admissibility of his testimony. *Troutner*, 2006 WL 3523542 at *6.

contamination sources. As already discussed, Mr. Vandeven adequately accounted for the Landfill, LeRoy's operations, and illegal disposal as potential sources of contamination and provided valid reasons for rejecting them.

Accordingly, the Court finds that Mr. Vandeven's opinion regarding causation is sufficiently reliable to be admitted.

b. Relevancy

Next, the Court must determine whether Mr. Vandeven's opinion is relevant, i.e. whether it would assist the trier of fact in understanding the evidence or determining a fact in issue. Fed. R. Ev. 702. "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Amakua Dev. LLC v. Warner*, No. 05 C 3082, 2007 WL 2028186, at *6 (N.D. Ill. July 10, 2007). Here, Defendants argue that Mr. Vandeven's testimony would not assist the trier of fact as he "has done nothing more than review aerial photographs and count the number of automobiles accepted by Defendants." Defs.' Mem. in Support of Mot. to Bar Test. of Pl.'s Expert, 18. However, as already discussed, the record supports that Mr. Vandeven engaged in a review of soil analysis, business records, and various other documents in arriving at his decision. Further, Mr. Vandeven's opinion that Defendants' operations are the primary source of lead contamination is relevant because it would assist the jury in determining whether Defendants caused the release of a hazardous substance (lead) on the Property.[7]

Accordingly, having determined that Mr. Vandeven's opinion regarding whether Defendants

---

[7] The Court notes that in Defendants' reply brief, they argue that Plaintiff claims that it need not establish causation between Defendants' operations and the contamination on the Property. However, Defendants are mistaken as Plaintiff does not make this argument, instead arguing that direct evidence of causation is not needed.

contributed to contamination on the Property is reliable and relevant, the Court concludes that this opinion/testimony may be admitted under *Daubert*.

*2. Mr. Vandeven's opinion regarding the expected remedial technique and estimated future costs*

Defendants next challenge Mr. Vandeven's opinion regarding the expected remediation and costs as failing to comply with the requirements of the National Contingency Plan ("NCP"). However, as discussed below in Section B(1)(d) of this Opinion and Order, because Plaintiff's Complaint seeks response costs incurred pursuant to investigating and assessing contamination on the Property, which do not need to comply with the requirements of the NCP that are cited by Defendants, rather than a specific amount of damages, whether Mr. Vandeven's testimony regarding expected costs complies with the NCP is irrelevant with regard to the admissibility of his opinion. Therefore, Defendants' argument that Mr. Vandeven's opinion must be barred based on failure to comply with the NCP must be rejected.

*3. Conclusion*

Based on the foregoing, the Court concludes that Mr. Vandeven's opinion is sufficiently reliable and relevant to be admitted and hereby denies the Defendants' Motion to Bar the Testimony of Plaintiff's Expert Jay Vandeven Pursuant to F.R.E. 702 and Daubert.

**B. Defendants' Motion for Summary Judgment**

In support of their Motion for Summary Judgment, Defendants argue that Plaintiff has failed to present any evidence that Defendants contributed to the release of lead on the Property, requiring summary judgment on the CERCLA § 107 and the Environmental Legal Action claims, and the damages that Plaintiff seeks are not consistent with the NCP and are not recoverable. In response, Plaintiff argues that the record supports that Defendants contributed to lead contamination on the

Property through the release of lead from cracked batteries, leaded gasoline spilled on the Property, and grading of contaminated soils. Further, Plaintiff contends that it incurred response costs that are recoverable under CERCLA.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case."

*Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that the opposing party's "response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson*, 477 U.S. at 255; *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's

role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

*1. Plaintiff's CERCLA § 107 claim*

"Congress enacted CERCLA in 1980 to provide a comprehensive response to the release of hazardous substances into the environment." *Am. Nat. Bank and Trust Co. of Chicago v. Harcros Chems., Inc.*, No. 95 C 3750, 1997 WL 281295, at *6 (N.D. Ill. May 20, 1997). CERCLA provides a mechanism "for clean up, compensation, and liability where there is a threat from hazardous substances." *Id.* "Congress pursued two purposes in enacting this legislation: first, to give the federal government the tools necessary to respond promptly and effectively to releases of hazardous substances and, second, to ensure that those responsible [for such releases] into the environment are liable for the cost of cleaning them up." *Id.* CERCLA imposes strict liability on responsible parties. *Id.*

CERCLA § 107(a) establishes liability and permits a cause of action to recover direct costs that a party incurs in cleaning up a contaminated site. *City of Martinsville v. Masterwear Corp.*, No. 1:04-cv-1994-RLY-WTL, 2006 WL 2710628, at *2 (S.D. Ind. Sept. 20, 2006). To establish a prima facie CERCLA § 107(a) claim, a party must show that (1) the Site in question is a "facility", (2) a release[8] or threatened release of hazardous substances at or from the facility has occurred, (3) the release or threatened release has resulted in response costs being incurred consistent with the NCP,

---

[8] Under CERCLA, a "release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22). There is no quantitative requirement on the term "release." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989).

and (4) the Defendant is a "responsible party."[9] *Id.*

Defendants do not dispute that the Property is a "facility" or that lead was released on the Property. Instead, Defendants argue that summary judgment must be granted on Plaintiff's CERCLA § 107(a) claim as Plaintiff has failed to show that a release of lead occurred on the Property during the Defendants' ownership and operations. Defendants further argue that Plaintiff may not recover the damages sought as such damages fail to comply with the NCP. In response, Plaintiff argues that it has shown that lead was released on the Property during Defendants' operations through the handling of cracked battery cases and leaded gasoline, as well as the movement of contaminated soil on the Property, and has incurred recoverable costs. The Court will evaluate each argument in turn.

a. Release of lead by cracked batteries handled during Defendants' operations

Defendants argue that Plaintiff has failed to show that their operations caused or contributed to lead contamination on the Property. In particular, Defendants argue that even though Mr. Vandeven identified batteries as the sole mechanism for release of lead, batteries were removed from vehicles upon arrival to the Property and were stored in an enclosed trailer, and he testified at his October 23, 2008 deposition that he was unaware of Defendants' procedure regarding batteries or where they were kept. Accordingly, Defendants argue that lead contamination on the Property could not have resulted from Defendants' handling of batteries.

Nonetheless, while Defendant Paul Shafer testified at his March 13, 2008 deposition that

---

[9] A "responsible party" includes any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of. 42 U.S.C. § 9607(a)(2).

The term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any [hazardous substance] into or on any land or water so that such [hazardous substance] or any constituent thereof may enter the environment . . . ." 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3).

Defendants took batteries out of vehicles when they first arrived on the Property to prevent people from driving them, he also testified that trespassers would engage in a demolition derby on the Property and that "to today they still do it," indicating that the vehicles still contained batteries while on the Property. Defs.' Mem. Support of Mot. Summ. J., Ex. C at 36:12. Further, Defendant Paul Shafer testified that Defendants would obtain cars that had been in an accident and batteries in some of the cars may have been cracked. Although Defendant Paul Shafer testified that most of the cars involved in accidents were not received by Defendants until 90 days after the accident, he did not indicate that this was an absolute rule. Defendant Paul Shafer also testified that trespassers would drive the cars through the fence or steal them and drive away, and admitted that batteries were kept in vehicles that Defendants used to transport parts on the Property. Defendant Paul Shafer's testimony indicates that batteries were left in the cars on the Property. Accordingly, based on the record, the Court concludes that Plaintiff has established a genuine issue of material fact as to whether lead was released onto the Property by cracked batteries, present in vehicles on the Property, and handled during Defendants' operations.

b. Release of lead by spilled leaded gasoline handled during Defendants' operations

Next, Defendants argue that lead contamination on the Property could not have occurred from a spill or release of leaded gasoline during Defendants' operations because gasoline was immediately removed from vehicles upon entering the Property. Further, Defendants argue that Mr. Vandeven discounted leaded gasoline as a source of contamination, thus precluding Plaintiff from now arguing to the contrary. Plaintiff relies on soil samples at the Property which indicate the presence of methyl tertiary-butyl ether (MTBE), a gasoline additive used after 1979, to support its claim that Defendants spilled leaded gasoline on the Property and it is a source of contamination.

While a plaintiff can survive summary judgment by introducing circumstantial evidence that a defendant released a hazardous substance on the Property, it cannot rely on evidence that is speculative. *Acme Printing Ink Co. v. Menard, Inc.*, 891 F. Supp. 1289, 1296 (E.D. Wis. 1995).

At both of his depositions, Mr. Vandeven testified that batteries were the source of lead contamination. In fact, as Defendants correctly point out, at Mr. Vandeven's October 23, 2008 deposition, he specifically rejected gasoline as a cause of contamination of lead on Section 2 of the Property as he had seen no indication of contamination from leaded gasoline. Even in his December 30, 2008 deposition, Mr. Vandeven testified that batteries were the primary source of lead contamination on the Property.

However, even considering Plaintiff's argument that gasoline is a source of contamination, the evidence that it relies on is too speculative. While the presence of MTBE indicates that gasoline was spilled at the Property, it does not indicate the presence of *leaded* gasoline. As Defendants correctly point out, lead, not MTBE, is the contaminant of concern in the instant matter. "MTBE has been used in U.S. gasoline at low levels since 1979 to *replace lead* as an octane enhancer . . . ." U.S. Environmental Protection Agency, Methyl Tertiary Butyl Ether (MTBE), Gasoline, *available at* http://www.epa.gov/MTBE/gas.htm (emphasis added). Because MTBE has been used as a *substitute* for lead, the presence of MTBE in the soil samples does not insinuate that the lead contamination came from leaded gasoline. Rather, this Court finds that Plaintiff's argument that the presence of MTBE, a substitute for lead, implies that lead contamination came from leaded gasoline "amount[s] to little more than speculation."[10] *Acme Printing Ink. Co.*, 891 F. Supp. at 1296.

---

[10] Defendants also argue that Plaintiff ignores illegal dumping that occurred on the Property as a possible source of contamination. However, like Plaintiff's argument that LeRoy Shafer is a source of contamination, it is Defendants' burden to show that a third party was the "sole cause" of the release of lead contamination on the Property. *See Westfarm Assocs. Ltd. P'ship. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 682-83.

Plaintiff also argues that leaded gasoline was still in heavy use throughout the 1980s, relying on the Declaration of Mr. Vandeven.[11] In support of this argument, Mr. Vandeven relies on a U.S. Environmental Protection Agency (EPA) Press Release indicating that lead use in gasoline during 1985 was significantly higher than projected in 1982, and estimated that lead use by 1988 would be 67% more than previously anticipated. *See* U.S. Environmental Protection Agency, Press Release: EPA Sets New Limits on Lead in Gasoline (March 4, 1985), *available at* http://www.epa.gov/history/topics/lead/01.htm. Further 16% of vehicles requiring gasoline, at that time, were being fueled with leaded gasoline. However, no evidence has been provided to the Court as to how many of those vehicles were used in Indiana, or that were brought onto Defendants' Property during their operations. Accordingly, Plaintiff's reliance on this evidence to establish that leaded gasoline caused contamination on the Property is too speculative and fails to raise a genuine issue of material fact.

c. Contamination of the Property through grading activities

Plaintiff further argues that Defendants are liable under CERCLA for moving and spreading contaminated soil throughout the Property by leveling the Property prior to selling it, which Plaintiff argues constitutes "disposal" under CERCLA. In response, Defendants argue that Plaintiff is improperly raising a new argument as "leveling" was not identified as a cause of contamination in

---

Defendants' allegations that illegal dumping may have been responsible for the lead contamination at issue, unsupported by the record, is insufficient. *United States v. W.R. Grace & Co.-Conn.*, 280 F. Supp. 2d 1135, 1147 (D. Mont. 2002) (allegations of third party liability, unsupported by the record, are insufficient to establish third party defense).

[11] In its Statement of Material Facts, Plaintiff argues that eyewitness testimony revealed that when gas was released from gas tanks, it sometimes leaked from the lines. However, the testimony that Plaintiff relies on indicates that this occurred at Paul's Portable Car Crusher, which is a different facility outside the Property at issue.

the initial expert report.[12]  Further, Defendants argue that they cannot be held liable for disposal by grading or leveling because they did not operate the Property at the time that the contaminants were released on the Property, which, according to Defendants, occurred during LeRoy Shafer's operations.

Under CERCLA, "disposal" includes dispersion of hazardous materials which exacerbates a pre-existing contamination on the property.  *See Alcan-Toyo Am., Inc. v. N. Ill. Gas Co.*, 881 F. Supp. 342, 346 (N.D. Ill. 1995); *Ganton Tech., Inc. v. Quadion Corp.*, 834 F. Supp. 1018, 1021-22 (N.D. Ill. 1993) (*citing Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338 (9th Cir. 1992)).  "Disposal" is not limited to the initial introduction of contaminants into a site. *Ganton*, 834 F. Supp. at 1022.

Here, Defendant Paul Shafer testified at his March 13, 2008 deposition that while closing down the operations on the Property, Defendants had to level the Property to clean it prior to turning it over to the new owner.  The record supports that Defendants' leveling activities resulted in areas of fill on Sections 2 and 3 of the Property.  The record also supports that a majority of soils containing elevated lead concentrations on the Property are found within the areas of fill.  As Plaintiff points out, Mr. Vandeven concluded that approximately 80% of soils between zero and two feet below the ground surface and 96% of soils between two and five feet below ground surface containing elevated levels of lead were located within the fill areas.

While Defendants argue that they did not own the Property at the time of release and cannot be held liable for disposal by leveling, Defendants misinterpret Plaintiff's allegations.  The activity that Plaintiff claims are also responsible for "disposal" of lead on the Property is Defendants'

_____

[12] The Court already denied this argument in its May 13, 2009 Order by finding that Mr. Vandeven's opinion regarding Defendants' leveling activities was not an improperly raised new argument.

leveling activities. The focus is on whether Defendants had control over the activity through which additional contamination took place–the leveling activities. Defendants do not dispute that they had control over the leveling activities while winding down operations on the Property. Thus, based on the foregoing evidence, the record supports that Defendants' leveling activities constituted a "disposal" under CERCLA.

However, the record also supports that no exacerbation of a pre-existing contamination occurred. Cases dealing with the issue of leveling/grading, in which the court found such activity to constitute "disposal" under CERCLA, involved leveling/grading that resulted in contamination of previously uncontaminated areas. *See Ganton*, 834 F. Supp. at 1021 (involving previously uncontaminated areas of the property that were contaminated by clean up operations); *Kaiser*, 976 F.2d at 1342 (involving spreading of tainted soil over uncontaminated portions of the property); *but see Alcan-Toyo*, 881 F. Supp at 346 (finding that no exacerbation of pre-existing contamination took place where contaminated soil was covered to prevent migration and leaching into soil and the area where the contaminated soil was placed was already contaminated). Here, although Defendants have not raised this argument, Plaintiff has failed to argue that the fill areas were uncontaminated prior to Defendants' leveling of the Property and has not provided any evidence indicating what the lead levels were in the fill areas prior to Defendants' leveling. Nonetheless, because the record supports that a majority of soils containing elevated lead concentrations are found within areas of fill, the Court finds that a genuine issue of material fact exists as to whether leveling resulted in "disposal" of lead on the Property. *See U.S. v. CDMG Realty Co.*, 96 F.3d 706, 720 (3rd Cir. 1996) (providing that "[a] factual dispute is genuine if the evidence is such that a reasonable factfinder could find in favor [of] the nonmoving party").

d. Response costs

Finally, Defendants argue that Plaintiff cannot recover its response costs because it has failed to comply with the NCP's requirements.[13] In response, Plaintiff argues that it has incurred response costs that are recoverable under CERCLA. In particular, Plaintiff argues that it has substantially complied with the NCP and, because it has not chosen a remedial strategy and seeks a declaratory judgment, whether its response costs are consistent with the NCP need not be determined at this stage of the proceedings.

The NCP is "a series of regulations promulgated by the EPA to establish 'procedures, criteria and responsibilities' for response actions conducted by both the government and private parties." *City of Martinsville*, 2006 WL 2710628 at *3. "The NCP is designed 'to assure that response actions are both cost effective and environmentally sound.'" *Id.* To recover response costs under CERCLA § 107, a plaintiff must show that it incurred the costs in compliance with the NCP. *PMC, Inc. v. Sherwin-Williams, Co.*, 151 F.3d 610, 616 (7th Cir. 1998). In particular, "substantial compliance" with the NCP is a prerequisite to CERCLA recovery. *Norfolk Southern Ry. Co. v. Gee Co.*, 158 F. Supp. 2d 878, 880 (N.D. Ill. 2001). Costs sought to be recovered must be necessary and consistent with the NCP. *Soo Line R. Co. v. Tang Industries, Inc.*, 998 F. Supp. 889, 895 (N.D. Ill. 1998).

Here, Plaintiff first argues that it substantially complied with the NCP because it has entered into Indiana's Voluntary Remediation Program ("VRP") to ensure a CERCLA-quality cleanup with

---

[13] In particular, Defendants argue that Plaintiff failed to conduct a remedial investigation/feasibility study, identify potential sources of contamination (particularly, the Gary Landfill), determine whether a removal or remediation action was necessary, and review proposed remedial alternatives and criteria under the NCP.

In relation to Defendants' argument that Plaintiff failed to evaluate potential sources of contamination, as discussed in the portion of the instant Opinion and Order dealing with the Motion to Bar, the Court has already determined that Mr. Vandeven adequately identified and discounted other potential sources of contamination (namely, the Landfill, Leroy Shafer's operations, and illegal dumping).

the IDEM's assistance. The involvement of a state environmental agency in approving cleanup plans and monitoring remediation progress satisfies the requirement of consistency with the NCP. *Nutrasweet*, 227 F.3d at 791; *see Norfolk*, 158 F. Supp. 2d at 883; *Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 752 (D. Md. 2001). However, as Defendants argue, the IDEM's level of involvement in the instant matter is likely insufficient to indicate NCP compliance. Here, Plaintiff has admitted that no cleanup option has been chosen. Further, while Plaintiff has submitted its Remedial Alternatives Assessment to the IDEM, the record supports that it has yet to receive a response, has no final remedial plan, has not submitted such a remedial plan to the IDEM, and has not submitted its Phase II report to the IDEM. Accordingly, the level of state agency involvement in the instant matter is insufficient to indicate NCP compliance as in other cases. *See Norfolk Southern Ry. Co. v. Gee Co.*, No. 98 C 1619, 2002 WL 31163777, at *28 (N.D. Ill. Sept. 30, 2002) (state agency received cleanup proposals and worked with plaintiff throughout cleanup process); *Sherwin-Williams*, 125 F. Supp. 2d at 753 (response consistent with direction of state agency that was involved throughout the cleanup process); *Nutrasweet*, 227 F.2d at 791 (state agency approved cleanup and monitored progress of remediation).

Nonetheless, Plaintiff may still recover its response costs if they are necessary and consistent with the NCP. *See Soo Line R. Co.*, 998 F. Supp. at 895. Here, Defendants argue that Plaintiff may not recover its sought costs because such costs are inconsistent with the NCP. Defendants assume, however, that Plaintiff is seeking between $5 million and $8 million in damages. Based on a review of the Complaint for Damages and briefs in this matter, the Court concludes that Defendants' assumption is incorrect.

Under the "Factual Allegations" section of Plaintiff's Complaint for Damages, Plaintiff

alleges that:

> It is *estimated* by Baker Environmental, a consultant for the City, that the reasonable cost to remediate the Property, to a level acceptable to IDEM, is between $2.24 million and *$8.73 million, although further investigation is necessary to completely characterize the contamination of the Property to the satisfaction of IDEM, and allow for a final estimate to be developed*.

Pl.'s Compl. ¶ 48 (emphasis added). Further, in the Affidavit of Mr. Vandeven, he opines that an appropriate remedial option would cost approximately $5 million. Accordingly, Defendants assume that Plaintiff seeks to recover these damages in the instant action.

However, this portion of the Complaint for Damages expressly provides that the dollar figures identified are an estimate and further provides that "further investigation is necessary . . . for a final estimate to be developed." *Id.* Further, Count One of the Complaint for Damages alleges that Plaintiff has incurred response costs and, in particular, costs associated with investigating and remediating lead on the Property. *See id.* at ¶¶ 51-52. Plaintiff also alleges that it "is entitled to recover its past response costs . . . ." *Id.* at ¶ 54. Furthermore, Count Four of the Complaint requests Declaratory Relief. Although Defendants are correct that Mr. Vandeven opined that $5 million would be the cost of remediation, and proposed a remedial action–excavation and capping, he also testified at his December 30, 2008 deposition that he was not recommending that Plaintiff implement his proposed remedy. Rather, Mr. Vandeven testified that he was just estimating what potential costs could be and what an appropriate remedy could be. Accordingly, the Court concludes that the language of the Complaint for Damages indicates that Plaintiff is seeking past response costs and a declaratory judgment for future response costs, and, based on the record, there is no indication that Plaintiff has adopted the estimated dollar figure provided by Mr. Vandeven or the proposed remedial action. Therefore, Plaintiff is not seeking to recover the specific amounts that Defendants allege.

Plaintiff's response brief to the instant Motion for Summary Judgment indicates that, with regard to past response costs, Plaintiff seeks to recover response costs incurred in investigating and assessing contamination on the Property. Where a plaintiff seeks costs incurred for initial site investigation and monitoring costs, a plaintiff is not required to show that the costs comply with the NCP. *Continental Title Co. v. Peoples Gas Light and Coke Co.*, No. 96 C 3257, 1999 WL 753933, at *3 (N.D. Ill. Sept. 15, 1999). Rather, "these costs are recoverable irrespective of compliance with the requirements of the NCP." *Id.* "Furthermore, initial monitoring, assessment, and evaluation expenses are recoverable absent any subsequent recoverable costs." *Id.* Based on the damages being claimed in this matter, Plaintiff may recover these response costs regardless of consistency with the NCP. Further, such costs are necessary under the NCP as "[o]btaining preliminary information on the levels of hazardous substances in the surrounding soil and sediment seems a necessary step before any further action can be properly taken." *Id.* at n. 2 (quoting *Gache v. Town of Harrison, NY*, 813 F. Supp. 1036, 1046 (S.D.N.Y. 1993)). Accordingly, to the extent that Plaintiff seeks to recover response costs associated with site investigation and assessment, the Court finds that a genuine issue of material fact exists as to whether Plaintiff's damages are recoverable.

Further, Plaintiff argues that since it requests a declaratory judgment with regard to Defendants' liability for future response actions, the appropriate stage for contesting consistency with the NCP is during the damages phase of litigation. In response, Defendants argue that Plaintiff must demonstrate compliance with the NCP, based on the mistaken assumption that Plaintiff seeks between $5 million and $8 million in damages, and has failed to produce evidence of a release by Defendants. However, given that the Court has already determined that a genuine issue of material fact exists as to whether a release occurred during Defendants' operations (through the handling of

batteries and leveling activities) and Plaintiff is not seeking the damages that Defendants allege, the Court need not address this issue as Plaintiff has complied with the NCP to the extent necessary to recover its requested response costs.

Additionally, under CERCLA, Plaintiff can obtain a declaratory judgment where it has incurred "some minimal level of expense associated with the alleged contamination, such as assessment or monitoring costs." *VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 694 (E.D. Wis. 1996). A declaratory judgment "is an appropriate remedy under CERCLA where it is not yet possible to determine the actual costs of the cleanup." *Bowen Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 476 (D.N.J. 1992). Here, no remedy has been selected. Accordingly, CERCLA-related cleanup costs are not currently determinable. Therefore, based on the record, Plaintiff's remedy would likely be a declaratory judgment as to Defendants' liability.

Accordingly, because the Court finds that genuine issues of material fact exist as to whether Defendants contributed to the lead contamination on the Property–through handling batteries and leveling–and whether Plaintiff's response costs are recoverable, the Court concludes that a genuine issue of material fact exists as to whether Plaintiff may establish a prima facie case under its CERCLA § 107 claim and summary judgment must be denied.

*2. Plaintiff's Indiana Environmental Legal Action claim*

Defendants further argue that summary judgment must be granted on Plaintiff's Indiana Environmental Legal Action claim as Plaintiff has failed to provide any evidence that Defendants contributed to the contamination on the Property.

The Indiana Environmental Legal Action statute provides that:

> A person[14] may, regardless of whether the person caused or contributed to the release of a hazardous substance . . . into the surface or subsurface soil . . . that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances . . . .

Ind. Code § 13-30-9-2. Under this statute, "'caused or contributed' requires some involvement by the actor which produces a result." *City of Martinsville*, 2006 WL 2710628 at *4. Given that the Court has already determined that a genuine issue of material fact exists as to whether Defendants contributed to the contamination on the Property with regard to the CERCLA § 107 claim, summary judgment must be denied as to the Environmental Legal Action statute claim.

### CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the Defendants Paul Shafer and Paul's Auto Yard, Inc.'s Motion for Summary Judgment [DE 69] and **DENIES** the Defendants' Motion to Bar the Testimony of Plaintiff's Expert Jay Vandeven Pursuant to F.R.E. 702 and Daubert [DE 82].

SO ORDERED this 2nd day of June, 2009.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record

---

[14] A city may pursue a claim under this statute. *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1284 (Ind. 2009).