# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| THE CITY OF GARY, INDIANA, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL SHAFER d/b/a PAUL'S AUTO YARD, | ) | |
| and PAUL'S AUTO YARD, INC., | ) | CAUSE NO.: |
| Defendants | ) | 2:07-CV-056-PRC |
| | ) | |
| v. | ) | |
| | ) | |
| WASTE MANAGEMENT SYSTEMS | ) | |
| n/k/a WASTE MANAGEMENT OF | ) | |
| INDIANA, L.L.C., | ) | |
| Third-Party Defendant | ) | |

## OPINION AND ORDER

This matter is before the Court on the Complaint [DE 1] filed by the Plaintiff the City of Gary, Indiana on February 26, 2007; the Answer [DE 13] filed by Defendants Paul Shafer d/b/a Paul's Auto Yard and Paul's Auto Yard, Inc. on April 30, 2007; the Third-Party Complaint [DE 14] filed by Defendants Paul Shafer d/b/a Paul's Auto Yard and Paul's Auto Yard, Inc. on April 30, 2007; the Third-Party Defendant's Answer [DE 34] filed by Third-Party Defendant Waste Management Systems n/k/a Waste Management of Indiana, L.L.C. on May 30, 2007; the Counterclaim [DE 61] filed by Defendants Paul Shafer d/b/a Paul's Auto Yard and Paul's Auto Yard, Inc. on September 30, 2008; and the Answer to Counterclaim [DE 63] filed by Plaintiff the City of Gary, Indiana on October 22, 2008.

On November 2, 3, 4, and 5, 2009, the Bench Trial proceedings were held in Hammond, Indiana. At the Bench Trial, Plaintiff the City of Gary, Indiana, appeared by its Environmental and MS4 Coordinator Dorreen Carey and by counsel Michael O. Nelson and Leah B. Silverthorn. Defendants Paul Shafer d/b/a Paul's Auto Yard and Paul's Auto Yard, Inc. appeared by Paul Shafer and by counsel Michael J. Maher and John P. Arranz. Third-Party Defendant Waste Management Systems n/k/a Waste Management of Indiana, L.L.C. appeared by counsel Michael O. Nelson and Leah B. Silverthorn.

In determination of these issues the Court **FINDS, ORDERS, ADJUDGES,** and **DECREES**:

## PROCEDURAL BACKGROUND

1.      On February 26, 2007, Plaintiff the City of Gary, Indiana, filed its Complaint alleging that it became the owner of real estate once formerly owned by Defendants Paul Shafer d/b/a Paul's Auto Yard (hereinafter for the sake of convenience referred to simply as Paul Shafer), that the real estate is in need of environmental remediation required by the United States Environmental Protection Agency (EPA), by the Indiana Department of Environmental Management (IDEM), and by the City of Gary Environmental Ordinance due to environmental contamination caused by Paul Shafer and Paul's Auto Yard, Inc.; that Paul Shafer and Paul's Auto Yard, Inc. created a nuisance on the real estate; that Paul Shafer and Paul's Auto Yard, Inc. should be required by monetary judgment and declaratory judgment to pay contribution toward past and future costs associated with the remediation according to their proportionate share of liability, pay a judgment for damages to the real estate, and pay for attorney fees and court costs.

2.      The Complaint by the City of Gary alleges that Paul Shafer and Paul's Auto Yard, Inc. are liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607 and under the Indiana Environmental Legal Actions law (ELA), Indiana Code § 13-30-9-1 through 13-30-9-8.

3.      On April 30, 2007, Defendants Paul Shafer and  Paul's Auto Yard,

Inc. filed their Answer denying the substantive allegations in the Complaint and asserting affirmative defenses.

4.      On April 30, 2007, Defendants Paul Shafer and  Paul's Auto Yard, Inc. also filed a Third-Party Complaint against Third-Party Defendant Waste Management Systems n/k/a Waste Management of Indiana, L.L.C. (hereinafter for the sake of convenience referred to as "Waste Management") alleging that Waste Management acquired ownership of the real estate from Paul Shafer and/or Paul's Auto Yard, Inc. and later conveyed ownership to the City of Gary, that Waste Management caused environmental contamination to the real estate, and requesting that Waste Management pay contribution toward past and future costs associated with the remediation according to its proportionate share of liability.

5.      On May 30, 2007, Third-Party Defendant Waste Management filed its Answer denying the substantive allegations in the Third-Party Complaint and asserting affirmative defenses.

6.      On September 30, 2008, Defendants Paul Shafer and  Paul's Auto Yard, Inc. filed their Counterclaim alleging that the City of Gary, in operation of its municipal landfill adjacent to the subject real estate, caused environmental contamination of the real estate and requesting that the City of Gary be required by Court judgment to pay contribution toward past and future costs associated with the remediation.

7.      On October 22, 2008, Plaintiff City of Gary filed its Answer denying the substantive allegations of Paul Shafer and Paul's Auto Yard, Inc. in the Counterclaim.

8.      On April 30, 2007, Paul Shafer and Paul's Auto Yard, Inc. filed a Motion For Partial Summary Judgment as to Count Three of Plaintiff's Complaint and a Memorandum in Support.  On May 30, 2007, the City of Gary filed a Response to the Motion For Partial Summary Judgment.  On June 13, 2007, Paul Shafer and Paul's Auto Yard, Inc. filed their Reply thereto.

9.      On October 4, 2007, the Court issued an Order granting the Motion For Partial Summary Judgment as to Count Three of Plaintiff's Complaint entering summary judgment on Count Three of the Complaint in favor of Paul Shafer and

Paul's Auto Yard, Inc. against the City of Gary.

10.     On April 30, 2007, Paul Shafer and Paul's Auto Yard, Inc. filed two Motions To Dismiss  pertaining to Count Five and Count Six of Plaintiff's Complaint, together with a Memorandum In Support.  On May 15, 2007, the City of Gary filed Responses in Opposition to the two Motions.  On May 22, 2007, Paul Shafer and  Paul's Auto Yard, Inc. filed Replies thereto.

11.     On October 4, 2007, the Court issued an Order granting both of the Motions To Dismiss Counts Five and Six and the Court dismissed Counts Five and Six of the Plaintiff's Complaint.

12.     On February 17, 2009, Paul Shafer and Paul's Auto Yard, Inc. filed a Motion For Summary Judgment and a Memorandum in Support.  On March 23, 2009, the City of Gary filed a Memorandum In Opposition to the summary judgment motion.  On April 6, 2009, Paul Shafer and Paul's Auto Yard, Inc. filed their Reply thereto.

13.     On June 2, 2009, the Court issued an Order denying the Motion For Summary Judgment.

14.     Thus, by the time of trial, the surviving Counts in Plaintiff's Complaint were Counts One, Two, and Four; the Counterclaim and Third-Party Complaint also remained at issue for trial.

15.     The case proceeded to Bench Trial which was held November 2, 3, 4, and 5, 2009.  The Court received evidence.  By agreement of the parties, trial on the amount of damages was bifurcated from trial on the liability issues so that trial on the damages issues (allocation of proportionate shares of liability and possibly the amounts of damages) will be held later in the event that the Court finds any of the parties to be liable.

16.     Following the trial, the Court ordered the parties to file Proposed Findings of Fact and Conclusions of Law by December 7, 2009.

17.     On December 7, 2009, the City of Gary and Paul Shafer and Paul's

4

Auto Yard, Inc. filed their separate Proposed Findings of Fact and Conclusions of Law [DE 163, DE 164]. Waste Management did not file any proposed findings of fact and conclusions of law.

18.    On February 1, 2010 the parties filed a joint stipulation submitting an additional evidentiary fact in response to the Court's request for the additional evidence.

## JURISDICTION AND VENUE

19.    This Court has federal question subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 based on the City of Gary's federal claims in its Complaint brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq. and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, arising out of the same facts and circumstances.

20.    Venue is proper under 28 U.S.C. § 1391(b)(2).

21.    On April 30, 2007, this case was reassigned to the undersigned Magistrate Judge. The parties filed forms of consent to have this case assigned to a Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, the undersigned Magistrate Judge has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## STANDARD OF PROOF

22.    This matter being a civil case, Plaintiff City of Gary carries the burden to prove the claims alleged in its Complaint and its affirmative defenses in its Answer to the Counterclaim by a preponderance of the evidence. Defendants Paul Shafer and Paul's Auto Yard, Inc. carry the burden to prove their Answer, the claims alleged in their Counterclaim, and the claims alleged in their Third-Party Complaint by a preponderance of the evidence. Waste Management carries the burden to prove the affirmative defenses in its Answer to the Third-Party Complaint by a preponderance of the evidence.

## FINDINGS OF FACT

5

23.     The findings of fact herein are based upon the trial evidence.  Where factual conflicts in the evidence exist, the findings herein are the facts the Court has determined to be more credible after resolving the factual conflicts.

24.     Where conflicts exist between the trial testimony of the City of Gary's expert witness Jay Vandeven and the trial testimony of Paul Shafer's and Paul's Auto Yard, Inc.'s expert witness Geoffrey Glanders, the Court finds Mr. Glanders' testimony to be more credible because his educational training is in geology (he is a licensed professional geologist), of the nature and superior extent of his professional experience in environmental matters,  he has professionally consulted on environmental matters related to 30 - 40 auto salvage business sites and over 100 landfill sites,  he is a certified hazardous materials manager,  he made at least two site visits to the former Paul's Auto Yard site, and  he interviewed numerous people in relation to his work in this case.

## THE REAL ESTATE SITE

25.     The real estate site (hereinafter for the sake of convenience sometimes referred to as "the Site") relevant to this case, the soil of which is contaminated by lead requiring environmental remediation, consists of parts of Section 2 and Section 3 of at least five sections now owned by the City of Gary.[1]

26.     The Site is real estate located on both the east and west sides of Colfax Avenue (Section 2 to the west of Colfax Avenue; Section 3 to the east; both sections bordered on the north by 21st Avenue) in the City of Gary, situated near an area of the City  known locally as the Black Oak neighborhood.

27.     The Site is part of a larger group of adjacent sections of real estate (five sections in total) owned by the City of Gary.  These five sections of real estate are designated by the City of Gary as part of its J-Pit Redevelopment Project, with the intent of City leaders to eventually redevelop the sections for residential, commercial, industrial, or other use, all within an 8200 acre Airport Redevelopment Zone.

---

[1] These Section designations are not part of the legal descriptions of the real estate; rather, they are designations made by the City of Gary for its own use in planning a redevelopment of the area properties.

6

28.     The Site (parts of Sections 2 and 3) is the former location of Paul Shafer's and Paul's Auto Yard, Inc.'s business operations.  Paul's Auto Yard operated at the eastern approximately one-fourth (1/4) of Section 2 and the northern and northeastern portions, approximately 22 acres, of Section 3 (Section 3 consisting of a total of approximately 27 acres).

29.     The City of Gary Municipal Landfill (now closed) was at all relevant times, and is, adjacent to and directly across the street north of the Section 3 parcel and directly across a street intersection northeast of the Section 2 parcel.

30.     Section 5 (the J-Pit) was at all relevant times, and is, adjacent to and directly across the street north of Section 2.  Section 5 (the J-Pit) was formerly a sand mine.

## RELEVANT HISTORY OF REAL ESTATE OWNERSHIP

31.     From the 1950's until approximately 1980, the Site (Sections 2 and 3) was owned by LeRoy Shafer (the father of Paul Shafer).  During that time, LeRoy Shafer operated a vehicle salvage business at the Site.

32.     From approximately May 28, 1980 until December 6, 1991, Sections 2 and 3 were owned by Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard.  On March 16, 1988, the business was incorporated and began existence as the corporate entity Paul's Auto Yard, Inc.  During this entire 1980 – 1991 time period, Paul Shafer as an individual owned the real estate Site.  The corporate entity Paul's Auto Yard, Inc. did not own the real estate Site.  From 1980 to March 1988 Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard operated a vehicle salvage business at the Site.  From March 1988 to December 1991 the corporate entity Paul's Auto Yard, Inc. operated the vehicle salvage business at the Site (it continued some business operations at the Site after December 1991 during a winding down time period – see the following paragraph).[2]

---

[2] Throughout this Order the Court sometimes refers to the Site as the "Paul's Auto Yard site" and refers to the business operation as "Paul's Auto Yard" where the distinction between Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard and the corporate entity Paul's Auto Yard, Inc. is unimportant in the context of the sentence.  At those places in this Order, these phrases refer to Paul Shafer as an individual and the corporate entity Paul's Auto Yard, Inc. collectively.

7

33.     From December 1991 until approximately 1998, Sections 2 and 3 were owned by Waste Management of Indiana, L.L.C.  During the first two years of this time period (1991 - 1993), Paul's Auto Yard, Inc. was, by agreement, removing its inventory of salvage vehicles, vehicle parts, tires, scrap metal, and the like from the premises but as it was doing so it still conducted active ongoing business, to some extent, by selling more vehicle parts.  After Paul's Auto Yard, Inc. vacated possession of the Site in around 1993, during the remainder of that time period, until approximately 1998, Waste Management continued to own the Site but did not conduct, or allow to be conducted, any ongoing business activity there.

34.     Beginning in approximately 1998, and continuing through the present time, Sections 2 and 3 are owned by the City of Gary.  The City of Gary has not conducted, and does not conduct, or allow to be conducted, any ongoing business activity at the Site.

## ASSESSMENT PROJECT

35.     At some point in time several years ago, the City of Gary applied for, and received, funds from the United States Environmental Protection Agency (EPA) in the form of a federal Brownfields Assessment Demonstration Pilot grant for environmental assessment of properties, including the Site.

36.     As part of the grant, it was either required or at least requested that the City of Gary enter into the EPA's Voluntary Remediation Program (VRP) and the City of Gary did so.

37.     As part of the grant, and part of the Voluntary Remediation Program, the EPA required that the Indiana Department of Environmental Management (IDEM) have regulatory oversight over the City of Gary's environmental assessment and remediation of the Site.

38.     The City of Gary conducted a Phase I Environmental Site Assessment by hiring independent-contractor consultant Environmental Design International, Inc. to conduct the assessment.  The assessment consisted of a search of databases including document review, site inspection, and personal interviews to determine if any recognized environmental conditions requiring remediation

existed.

39.     Environmental Design International, Inc. issued its Phase I
Environmental Site Assessment report to the City of Gary on July 2, 2001.  The
Phase I report found that environmental conditions possibly requiring remediation
did exist and it recommended sampling and testing of soil at the former Paul's
Auto Yard site.

40.     Later the City of Gary conducted a Phase II Environmental Site
Assessment by hiring independent-contractor consultant Baker Environmental, Inc.
to conduct the assessment.  The purpose of the Phase II assessment was to conduct
soil testing at the former Paul's Auto Yard site and, if environmental
contamination be found, to set forth remedial alternatives.  That assessment
consisted of analysis of the surface soil, subsurface soil, and groundwater.

41.     The City of Gary, by its independent-contractor Baker Environmental,
Inc., conducted soil testing for lead contamination at only those portions of
Sections 2 and 3 where Paul Shafer and Paul's Auto Yard, Inc. conducted their
ongoing business operations.  There is no evidence that the City of Gary conducted
soil testing at the remainder areas of Sections 2 and 3, so the Court cannot
determine if those nearby areas also contain lead contamination.

42.     Baker Environmental, Inc. issued its Phase II Environmental Site
Assessment report to the City of Gary in February 2004 and issued its Remedial
Alternatives Assessment report to the City of Gary in July 2004.

43.     Neither the Phase II Environmental Assessment report nor any other
evidence in this case indicates the timing of releases of lead contamination into the
Site soil.

44.     The Phase II Remedial Alternatives Assessment report finds that the
soil and subsurface soil at the former Paul's Auto Yard site contains several
organic and metal contaminants that exceed Risk Integrated System of Closure
(RISC) cleanup objectives for future residential use of the Site, with lead being  the
most prevalent site contaminant and the one in the highest concentrations.

45.     The parties agreed for purposes of the issues, trial, and judgment in

this case that lead is the only contaminant of concern in the Site soil. They also stipulated that lead is an environmentally hazardous substance.

46.     The Phase II Remedial Alternatives Assessment report recommends that the City of Gary remediate the soil at the Site.  It presents five remedial action alternatives with estimated costs ranging from approximately $545,000.00 to approximately $8,733,000.00.

47.     The City of Gary has already incurred preliminary costs in connection with environmental contamination of the Site (various site assessments and reports in connection therewith by at least three independent-contractor consultants, local community education and input meetings, regulatory oversight costs, and other costs).

48.     A goal of the City of Gary is to have the contaminated soil at the Site sufficiently remediated to EPA and IDEM standards so that those agencies issue to the City of Gary a written covenant not to sue.  Receipt of a covenant not to sue will then, as a practical matter, enable the City of Gary to redevelop the Site itself or market the Site for sale to one or more land developers.

## LEAD CONTAMINATION OF THE SOIL

49.     IDEM has established an Industrial Default Closure Level as a lead contamination attainment goal for industrial use properties and a Residential Default Closure Level as a lead contamination attainment goal for residential use properties.  These determinations by IDEM were made to address human health concerns based on exposure to contaminants.

50.     IDEM's Industrial Default Closure Level for lead contamination in soil is 230 mg/kg.

51.     IDEM's Residential Default Closure Level for lead contamination in soil is 81mg/kg.

52.     Baker Environmental, Inc. bore approximately 63 soil samples across the former Paul's Auto Yard site and tested those soil samples for levels of lead

contamination.

53.     Baker Environmental, Inc's testing shows that in the *top two feet* of soil at the Site (parts of both Sections 2 and 3):

---     14 of the samples were below IDEM Residential Default Closure Levels (81 mg/kg) ranging from a low of 2.3 mg/kg to a high of 76 mg/kg;

---     49 of the samples were above IDEM Residential Default Closure Levels (81 mg/kg) ranging from a low of 82 mg/kg to a high of 3800 mg/kg;

---     31 of the samples were below IDEM Industrial Default Closure Levels (230 mg/kg) ranging from a low of 2.3 mg/kg to a high of 190 mg/kg;

---     32 of the samples were above IDEM Industrial Default Closure Levels (230 mg/kg) ranging from a low of 240 mg/kg to a high of 3800 mg/kg.

54.     Baker Environmental, Inc.'s testing shows that in the stratum of soil *between two feet and five feet below* the ground surface at the Site (parts of both Sections 2 and 3):

---     36 of the samples were below IDEM Residential Default Closure Levels (81 mg/kg) ranging from a low of 1.1 mg/kg to a high of 19 mg/kg;

---     27 of the samples were above IDEM Residential Default Closure Levels (81 mg/kg) ranging from a low of 99 mg/kg to a high of 3200 mg/kg;

---     55 of the samples were below IDEM Industrial Default Closure Levels (230 mg/kg) ranging from a low of 1.1 mg/kg to a high of 200 mg/kg;

---      8 of the samples were above IDEM Industrial Default Closure Levels (230 mg/kg) ranging from a low of 300 mg/kg to a high of 3200 mg/kg.

## LEROY SHAFER'S BUSINESS OPERATIONS AT THE SITE

55.      LeRoy Shafer (deceased and not a party to this lawsuit) operated a vehicle salvage business at the Site from the 1950's until approximately 1980, but he operated only on the approximate eastern one-fourth (1/4) of the Section 2 area, and not on any of the Section 3 area.

56.      During LeRoy Shafer's business operations, the Section 3 area was generally wooded and brush-covered.  There is no evidence that during that time period LeRoy Shafer used or stored vehicle batteries on the Section 3 area nor is there evidence of any release of lead contamination onto the soil in the Section 3 area by him.

57.      During LeRoy Shafer's business operations, in the Section 2 area, he stacked junked vehicles one upon another, with stacks as high as 30 feet, with the batteries still in the vehicles, or sometimes he left vehicle batteries sitting on the ground.  When he received a junk vehicle, it was common for his business to puncture holes in the gasoline tanks and let leaded gasoline[3] run onto the ground and soak into the soil, and it was not uncommon for his business to burn junked vehicles at the business site to the extent that they would burn.

58.      During that time period vehicle batteries had relatively little or no salvage or resale value.

## PAUL'S AUTO YARD'S BUSINESS OPERATIONS AT THE SITE (ISSUE OF VEHICLE BATTERIES)

59.      Paul Shafer and Paul's Auto Yard, Inc. operated a vehicle salvage

---

[3]During some of that period of time most vehicles operated on leaded gasoline.

business at the Site on parts of both the Section 2 and Section 3 areas from approximately 1980 through approximately 1993.

60.    Governmental regulatory attention to vehicle salvage businesses increased during the time period that Paul's Auto Yard conducted its business operations at the Site.

61.    During the time period that Paul's Auto Yard conducted its business operations at the Site, the salvage value and resale value of used vehicle batteries significantly increased.

62.    The primary (and apparently sole) business activity of Paul's Auto Yard at the Site was the purchase of old, worn out, or damaged vehicles by the pound for their salvage value.  The business removed various auto parts from the salvage vehicles and sold the parts to retail and other customers.

63.    Immediately upon receiving a vehicle onto the Site, Paul's Auto Yard routinely, as a matter of course, removed the batteries from the vehicles that even had batteries in them at that point in time, removed the radiators, and drained gasoline and other fluids from the vehicles into containers.

64.    In addition to receiving old worn out vehicles, Paul's Auto Yard also received a substantial number of vehicles damaged in collisions.  Immediately following the collisions, these damaged vehicles were first towed away from the collision site and stored at various impound lots for approximately 30 – 60 days or longer.  The soonest that Paul's Auto Yard received these collision-damaged vehicles was approximately 60 days following the collision.  Only approximately 1% of these collision-damaged vehicles had batteries still in them when they were eventually brought to Paul's Auto Yard.  These collision-damaged vehicles were towed to the Paul's Auto Yard site.

65.    To the small extent that Paul's Auto Yard did receive vehicle batteries from vehicles that had been involved in a collision, there is no evidence that any such batteries leaked any battery acid or lead on the Site.

66.    Of the non-collision-damaged vehicles brought to Paul's Auto Yard and purchased by it, some of those vehicles also lacked batteries before being

brought to the Site (they were towed) because the owners removed the batteries to sell as salvage to recycling businesses.  By removing and selling their batteries themselves before delivering their vehicles to Paul's Auto Yard, the vehicle owners could receive a higher price for their batteries than Paul's Auto Yard would pay them since Paul's Auto Yard purchased vehicles at a price calculated only by gross vehicle weight and did not purchase batteries separately.

67.    Of all the vehicles of any type brought to Paul's Auto Yard and purchased by it, only approximately 20%  had batteries in them by the time they were brought to the Site.

68.    Vehicle batteries removed by Paul's Auto Yard from the vehicles brought onto the Site were either placed in the business' office and displayed for sale to customers, or were placed in storage for eventual sale to businesses which purchased salvaged batteries.

69.    The stored batteries were placed inside a fully enclosed trailer parked at a location in the Section 2 area.  The trailer floor was steel.  The trailer had plastic lining to prevent any leakage from exiting the trailer.  Each battery was wrapped in Saran wrap to further prevent any leakage.  The wrapped batteries were placed on pallets inside the trailer.  Approximately once per week these stored batteries were sold by Paul's Auto Yard to businesses which purchased and recycled vehicle batteries.

70.    If damage to one of the battery storage trailers ever occurred, Paul's Auto Yard would replace it with another trailer.  Each time stored batteries were removed from the trailer (for sale to other businesses),  Paul's Auto Yard employees inspected the floor of the trailer to make sure no leakage had occurred.

71.    There is no evidence that vehicle batteries ever leaked while stored in the trailer or while held and displayed in the business office.

72.    There is no evidence that Paul's Auto Yard ever otherwise caused or allowed vehicle batteries to leak at the Site.

73.    There is no evidence that Paul's Auto Yard ever kept or stored

14

vehicle batteries on Section 3 of the Site.

74.    The City of Gary alleges that people would enter Paul's Auto Yard after business hours and drive junk vehicles about, crashing into each other in a "demolition derby" type of activity, suggesting the presence of junk vehicles on the Site having batteries still in them and possibly getting cracked and leaking from the collisions.  This was not a frequent occurrence, however, and the implication is inaccurate.  Paul's Auto Yard did keep one or two operational junk vehicles with the batteries still in them.  These were called "torch wagons."  Their purpose was to transport employees, customers, and tools through the rows of inventory vehicles during business hours so a vehicle part could be removed for sale to a customer.  On rare occasions a thief or other trespasser entered the premises after business hours and drove a "torch wagon" in the process of stealing vehicle parts.

75.    On some of those occasions, the "torch wagon" was crashed but there is no evidence that any of those incidents resulted in damage to or leakage from a battery.

76.     Paul Shafer as an individual proprietor also operated a separate business known as Paul's Portable Car Crusher, operating at various salvage yards in northern Indiana.  In this business he operated portable equipment that crushed salvage vehicles into cubes and sold them for salvage value.  He did not operate this business nor crush any vehicles at the Paul's Auto Yard site.

77.    At no time at the Paul's Auto Yard site did the business clean vehicle parts with gasoline or any other liquids containing lead, nor did it shred interior parts of vehicles.

78.    The City of Gary estimates that during the years of Paul's Auto Yard's business operations at the Site it took in approximately 100,000 vehicle batteries. This calculation is incorrect.  The calculation mistakenly assumes that every salvage vehicle purchased by Paul's Auto Yard contained a battery (only approximately 20% of the vehicles contained batteries upon arrival).  The calculation mistakenly assumes that all vehicles referred to in the business records were brought onto the Site (the records include many vehicles sold by the business directly to vehicle brokers with the vehicles never being brought to the Site; the records also include many vehicles that were crushed off-site by Paul's Portable

15

Car Crusher business which were never brought to the Site).

79.     Vehicle batteries contain high concentrations of sulphuric acid (battery acid).  When released into soil, sulphuric acid oxidizes and turns into the chemical compound sulfate which remains in the soil as a residue.  Limited soil testing for sulfate was done at the Site.  The results of the testing at the Site showed no traces of sulfate.

## MOVEMENT OF SOIL AT THE PAUL'S AUTO YARD SITE

80.     When Paul Shafer began business operations, Section 3 was a wooded area with no roadway on it.  Paul Shafer or Paul's Auto Yard, Inc. caused a dirt road to be built across part or much of Section 3.  There is no evidence whether construction of the road necessarily involved soil movement at the Site.

81.     When Paul Shafer sold the Site to Waste Management in December 1991,  Paul's Auto Yard, Inc. had two years, until approximately 1993, by agreement, to rid the site of salvage vehicles, vehicle parts, tires, scrap metal and the like.  At that time large piles of old tires existed.  Dirt, metal, and other objects were interspersed in the piles of tires.  In the process of removing the piles of tires, Paul's Auto Yard, Inc. disturbed the dirt, metal, and other objects to the extent necessary to scoop up and remove the tires.  During this process, however, Paul's Auto Yard, Inc. did not move dirt to any other location on the Site nor do any leveling or grading of dirt.

82.     In the March 13, 2008 pre-trial deposition of Paul Shafer, he stated that Paul's Auto Yard, Inc., in preparation for turning over the Site to its new owner Waste Management, did "level" the Site but he explained his use of that term to mean removal of the vehicles, tires, scrap metal, and the like down to the surface of the ground.  Paul Shafer stated in his deposition beginning at line 19 of page 205:

> It was clean, spotless, we had to go in and level it, take all the tires out and take all the metal out of it, take everything that we could get out of it to clean it.

In the November 2009 Bench Trial, Paul Shafer testified on this point:

16

So we cleaned it.  We tore down the piles of stuff and leveled what we could there.  We did push up the tires with a loader and we had to level small piles of dirt and whatever it was.   We didn't level the yard.  Over the years we leveled, you know, the gravel or whatever, you know, kept it level.  We didn't dig down and grade it or whatever. . . . we didn't level the yard.  We kept it smooth and level.  We didn't back drag but –  – not dig down and level it or whatever you mean.

83.     In his direct exam testimony at trial, regarding Paul's Auto Yard, Inc.'s  preparation of the Site for turning over possession of it to Waste Management, Paul Shafer testified:

> Q.     Okay.  Did you have to do anything to the surface of the site?
>
> A.     No.  We had to dig through the piles of tires, you know, 'cause they was all pushed up in a pile.  There was dirt and metal and stuff like that in the piles from over the years.
>
> Q.     And did you move these piles around?
>
> A.     We really didn't move them.  We had to break them up, take the tires out of them.
>
> Q.     And what happened to the dirt you used to –  – ?
>
> A.     It was left there.
>
> Q.     In the exact same area where it was before?
>
> A.     Just about.
>
> Q.     Just about?  So close?
>
> A.     Uh-huh.

Trial transcript: Vol. 2, p. 50, line 25 through p. 51, line 13.

17

84.     There is no other evidence in the record of Paul Shafer or Paul's Auto Yard, Inc. moving any soil at the Site.  There is no evidence of Paul Shafer or Paul's Auto Yard, Inc. digging, excavating, grading, or redistributing soil at the Site.

85.     There is evidence in the record that some unknown person(s) at some unknown time(s) graded and leveled the soil at the Site (the evidence of car parts, rubber, glass, plastic, auto fluff, and the like being covered with soil and thereafter existing below the soil surface), but there is no evidence indicating Paul Shafer or Paul's Auto Yard, Inc. did so.  There is evidence indicating that Waste Management graded and moved soil at the Site and there is evidence (Paul Shafer's testimony) that Paul Shafer and Paul's Auto Yard, Inc. did not do so.

86.     Thus, the Court finds that Paul's Auto Yard, Inc. did only *de minimus* moving of soil (release or disposal) at the Site: limited to lifting some dirt that was interspersed in piles of tires and slightly moving the dirt and only at the time of closing Paul's Auto Yard, Inc.'s  business operations at the Site.  At the time of this minimal movement of soil (release or disposal) between December 1991 and late 1993, Paul Shafer, as an individual, was not an owner of the Site but the corporate entity Paul's Auto Yard, Inc. was an operator of business at the Site.

## WASTE MANAGEMENT'S MOVEMENT OF SOIL AT THE SITE

87.     Ownership of the Site property was conveyed from Paul Shafer to Waste Management in December 1991.  Paul's Auto Yard, Inc. continued to possess the property for another two years until approximately 1993.  During that two year time period, Paul's Auto Yard, Inc. conducted some further ongoing business operations at the Site but at the same time removed salvage vehicles, vehicle parts, tires, scrap metal, and the like.

88.     Waste Management purchased the Site to eventually use as a buffer zone in connection with Waste Management's plan to open a landfill at the J-Pit area (the former sand mine).

89.     Waste Management did not conduct any regular or ongoing business operations at the Site.  Waste Management assisted the City of Gary with removal

18

of things improperly dumped at the Site such as couches, stoves, shingles, bags of garbage, and other debris.  While doing this Waste Management sometimes picked up dirt with the objects and thereby moved the dirt to some extent.

90.    In addition, Waste Management graded soil at both Sections 2 and 3 with a grader or loader, moving dirt at the Site.  It did so weekly for some unspecified length of time.

## RUN-OFF FROM GARY LANDFILL ONTO THE SITE

91.    The City of Gary Municipal Landfill was, and is, located immediately adjacent to the Paul's Auto Yard site.  It is directly across the street north of Section 3.  It is directly across a street intersection northeast of Section 2.

92.    The Gary Municipal Landfill has existed and operated at its site since approximately the 1950's.

93.    At least until approximately the end of the 1980's there was no fence or other barrier around the Gary Landfill.  It was an open garbage and trash dump until that time with little or no effective regulation by anyone of what substances were deposited in it.  It wasn't until approximately the 1970's when IDEM began inspecting the Gary Landfill.

94.    After fencing was eventually erected at the Gary Landfill, the fencing remained largely ineffective during the years when Paul Shafer owned the adjacent Site and during the years when Paul's Auto Yard, Inc. operated the business at the Site (and even later when Waste Management owned the Site) due to breaches in the fencing large enough for vehicles to pass through.  At some point in time the City of Gary placed heavy concrete barriers to block unauthorized vehicular traffic into the landfill but those, too, were ineffective because they were often out of place enough to allow vehicular traffic to enter the landfill.

95.    Unauthorized dumping of a wide variety of garbage, trash, discarded household items, construction debris, and other items occurred frequently at the Gary Landfill during the years when Paul Shafer owned the adjacent Site, during the years when Paul's Auto Yard, Inc. operated the business at the adjacent Site, and later when Waste Management owned the adjacent Site.

19

96.    An unknown number of vehicle batteries containing lead were deposited into the Gary Landfill over the years.  Paul Shafer testified that during the 1980's Gary Landfill employees "every day" brought vehicle batteries picked from the Gary Landfill into Paul's Auto Yard and sold them for salvage value to Paul's Auto Yard.  It is probable that in years prior to the 1980's vehicle batteries were deposited into the Gary Landfill and remained there rather than being picked out.

97.    Auto fluff or auto grinding fluff are terms used to describe the various materials found in the interior or cabin of vehicles such as various materials used to make seats, dash boards, dash board instrumentation, door liners, roof liners, etc.  Normally auto fluff is collectively ground or shredded when a vehicle is dismantled at the end of its useful life.  The Gary Landfill accepted deposits of auto fluff over the years.  Auto fluff typically contains lead in concentrations of several thousand parts per million or several thousand milligrams per kilogram.

98.    Slag is a by-product material that results from the steel-making process.  The City of Gary is located in a region that contains several extremely large steel-making facilities and related businesses, some of the largest in the world.[4]  Slag contains lead.  The Gary Landfill accepted deposits of slag over the years.  The Gary Landfill even constructed roadways, trenches, and a berm within its landfill all made of slag.

99.    The Gary Landfill accepted deposits of other steel-making waste material over the years.  These steel-making wastes contained lead in concentrations of 1% – 5%.  These wastes came from extremely large steel-making operations, a variety of metal-working and metal-melting operations in the regional area, and likely from a lead smelter operation which was producing lead-containing waste material (since it was located within five miles of the Gary Landfill).  Lead smelting waste material contains up to 50% lead.

100.    The Gary Landfill accepted liquid hazardous substances (sludge) from various industrial operations (at one point up to 5,000 gallons of liquid

---

[4] A nickname for the City of Gary is the "Steel City."  Its minor league baseball stadium is named "the Steel Yard."

hazardous substance per week just from one chemical manufacturer) some of which likely contained lead.

101.   The Gary Landfill accepted construction debris over the years which commonly included items bearing dried lead-based paint.

102.   The crest of the mound at the Gary Landfill, built of garbage, trash, debris, and industrial waste, is approximately 100 feet higher in elevation than the level of elevation at the Paul's Auto Yard site.  The south slope of the Gary Landfill mound (leading to the Paul's Auto Yard site) is steeper than the north slope.

103.   Lead is relatively heavy when in soil and it tends to adhere to the soil, so migration of lead from one location in soil to another does not easily occur.  However, movement of the soil itself causes migration of the lead therein and heavy liquid pressure, such as water from heavy rains or flooding, can cause migration of the lead by migration of soil sediment containing the lead.

104.   On some occasions, City of Gary employees bulldozed landfill soil from the Gary Landfill onto the Paul's Auto Yard site.

105.   Very frequently (Paul Shafer testified it was daily), City of Gary employees pumped leachate liquids from inside, and on, the Gary Landfill directly down the south side of the landfill mound, resulting in the leachate liquids flowing onto the Paul's Auto Yard site.  Leachate is decomposed landfill contents which have turned into liquid form.

106.   Over the years leachate from the Gary Landfill ran off directly onto the Paul's Auto Yard site.  Although, in around 1993, the Gary Landfill constructed a berm to attempt to block leachate and rain water from running onto the Paul's Auto Yard site, the berm was not effective in doing so because storm water from the landfill migrated through or around the berm, especially at the southwest corner of the berm.

107.   The berm constructed on the landfill site by the City of Gary, located close to the Paul's Auto Yard site and intended to block leachate run-off and rain water run-off, was itself made of slag.  Slag contains lead.  So leachate and rain

water washed over the lead-containing slag material of the berm onto the Paul's Auto Yard site.

108.    The former Paul's Auto Yard site is an area of low elevation. After heavy rain, large amounts of liquid run-off traveling south and west exited from the Gary Landfill onto the Paul's Auto Yard site.  Soil sedimentation and various substances from the landfill were regularly deposited onto the Paul's Auto Yard site as a result of any heavy rain.  The run-off liquid was sometimes brown, gray, chalky, or milky in appearance – indicative of slag.  It would frequently run across and flood large portions of both Sections 2 and 3, especially the low spots,  and Colfax Avenue.  Upon the run-off liquid drying, it left trails of soil sediment from the landfill and discoloration of the Paul's Auto Yard soil.

109.    There is a correlation between the distribution of lead concentrations on the Paul's Auto Yard site and the drainage patterns on the Site. The lead is most heavily concentrated in the lower lying areas, having accumulated from soil sediment, containing lead, washed over from the Gary Landfill site.

110.    There was no evidence presented of any testing for the presence of lead on or in the soil of the Gary Landfill site.

111.    The Gary Landfill is a significant source of lead contamination in the soil at the Paul's Auto Yard site.

## CONCLUSIONS OF LAW

### CERCLA

112.    The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, was enacted "to provide a comprehensive response to the release of hazardous substances into the environment." *American National Bank & Trust Co. of Chicago  v.  Harcros Chemicals, Inc.*, No. 95 C 3750, 1997 WL 281295, at *6 (N.D. Ill. May 20, 1997).

It was enacted to promote the voluntary remediation of hazardous substances "while holding responsible parties accountable for the response costs that their past activities induced." *Metropolitan Water Reclamation District of Greater Chicago v. North American Galvanizing & Coatings, Inc.*, 473 F.3d 824, 836 (7th Cir. 2007).

113.   CERCLA § 107(a) establishes liability and permits a cause of action to recover direct costs which a party incurs in cleaning up a contaminated site.  42 U.S.C. § 9607(a).  *City of Martinsville v. Masterwear Corp.*, No. 1:04-cv-1994-RLY-WTL, 2006 WL 2710628, at *2 (S.D. Ind. Sept. 20, 2006).  The liability under this section is strict liability and joint and several liability; innocence of the defendant is irrelevant.  *Metropolitan Water*, 473 F.3d 824, 827; *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 343 (7th Cir. 1994).  This right of recovery includes both costs that have already been incurred as well as future costs for completion of the clean-up.  *In Re Dant & Russell, Inc.*, 951 F.2d 246, 249-250 (9th Cir. 1991).

114.   To establish liability under CERCLA § 107(a) a plaintiff must prove four elements:

(A)    the site in question is a "facility,"

(B)    a release or threatened release of a hazardous substance has occurred,

(C)    the release or threatened release has caused response costs to be incurred, and

(D)    the defendant is a responsible party.

*Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); 42 U.S.C. § 9607(a).

115.   Under CERCLA  § 107(b) there are three defenses available to avoid liability.  They are if the release or threatened release of a hazardous substance was:

(A)    an act of God,

23

(B)   an act of war, or

(C)   an act or omission of a third party (unless it occurred in connection with a contractual relationship with the defendant) if the defendant exercised due care concerning the hazardous substance and took precautions against foreseeable acts or omissions of the third party and against the foreseeable consequences of the third party's acts or omissions.

42 U.S.C. § 9607(b).  The defendant bears the burden to prove that the contamination was caused solely by the act or omission of an unrelated third party. *Crofton Ventures Ltd. Partnership v.  G & H Partnership*, 258 F.3d 292, 297 (4th Cir. 2001).

116.   Under CERCLA a "release" includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . ."  42 U.S.C. § 9601(22).  There is no quantitative requirement on the term "release."  *Amoco Oil Co.  v.  Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989).

117.   Under CERCLA the term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any [hazardous substance] into or on any land or water so that such [hazardous substance] or any constituent thereof may enter the environment . . ."  42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3).

118.   Under CERCLA a "responsible party" includes "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).

119.   The Paul's Auto Yard site (Sections 2 and 3) is a "facility" as that term is defined at 42 U.S.C. § 9601(9) and for purposes of 42 U.S.C. § 9607(a) liability (stipulated by the parties in the Second Amended Pre-Trial Order).

120.   Lead is a "hazardous substance" as that term is defined at 42 U.S.C. § 9601(14) and § 9601(33) and for purposes of 42 U.S.C. § 9607(a) liability (stipulated by the parties in the Second Amended Pre-Trial Order).

24

121.   Under CERCLA, at 42 U.S.C. § 113(f), a landowner may seek contribution from another person who is liable or potentially liable under § 107(a). *Nutrasweet Co.  v.  X-L Eng'g Co.*, 227 F.3d 776, 783-784 (7ᵗʰ Cir. 2000).

122.   Under "the CERCLA statutory scheme, § 107 . . . governs liability, while § 113(f) creates a mechanism for apportioning that liability among responsible parties."  *Id.* at 784.

123.   "CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence."  *Tosco Corp.  v.  Koch Industries, Inc.*, 216 F.3d 886, 892 (10ᵗʰ Cir. 2000); *see Sherwin-Williams Co.  v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 750 (D. Md. 2001) (providing that "CERCLA liability may be assessed on circumstantial evidence.").

124.   Under CERCLA "disposal" includes dispersion of a hazardous substance which exacerbates a pre-existing contamination on the property.  *See Alcan-Toyo Am., Inc.  v.  N. Ill. Gas Co.*, 881 F. Supp. 342, 346 (N.D. Ill 1995); *Ganton Tech., v.  Quadion Corp.*, 834 F. Supp. 1018, 1021-22 (N.D. Ill. 1993) (*citing Kaiser Aluminum & Chemical Corp.  v.  Catellus Dev. Corp.*, 976 F.2d 1338 (9ᵗʰ Cir. 1992)).

125.   "Disposal" is not limited to the initial introduction of contaminants into a site.  *Ganton*, 834 F. Supp. at 1022.  Rather, "whether a particular action constitutes a disposal can depend on the context of the entire situation . . ."  *Id.*; *Amcast Industrial Corp.  v.  Detrex Corp.*, 2 F.3d 746, 750 (7ᵗʰ Cir. 1993).

126.   There are no quantitative levels of hazardous substances required to trigger liability under CERCLA as the amount of concentration of a hazardous substance is irrelevant for CERCLA liability purposes.  *Illinois v.  Grigoleit Co.*, 104 F. Supp. 2d 967, 977 (C.D. Ill. 2000).  "CERCLA, on its face, applies to 'any' hazardous substance, and it does not impose quantitative requirements."  *Id.*

127.   "The absence of such quantity requirements in CERCLA leads inevitably to the conclusion that Congress planned for the 'hazardous substance' definition to include even minimal amounts of pollution."  *Id.*

128.   To recover some response costs under CERCLA § 107(a), a plaintiff must show that it incurred the costs in compliance with the EPA's National Contingency Plan (NCP). *PMC, Inc.  v.  Sherwin-Williams, Co.*, 151 F.3d 610, 616 (7th Cir. 1998).  In particular, "substantial compliance" with the NCP is a prerequisite to CERCLA recovery.  *Norfolk-Southern Ry. Co.  v.  Gee Co.*, 158 F. Supp. 2d 878, 880 (N.D. Ill. 2001).  Costs sought to be recovered must be necessary and consistent with the NCP.  *Soo Line R. Co.  v.  Tang Industries, Inc.*, 998 F. Supp. 889, 895 (N.D. Ill. 1998).

129.   Where a plaintiff seeks costs incurred for initial site investigation and monitoring costs, a plaintiff is not required to show that the costs comply with the NCP. *Continental Title Co.  v.  Peoples Gas Light and Coke Co.*, No. 96 C 3257, 1999 WL 753933, at *3 (N.D. Ill. Sept. 15, 1999).  Rather, "these costs are recoverable irrespective of compliance with the requirements of the NCP." *Id.* "Furthermore, initial monitoring, assessment, and evaluation expenses are recoverable absent any subsequent recoverable costs." *Id.*

130.   Under CERCLA § 107(b)(3), a person who is otherwise liable under § 107(a) can escape liability if that person:

> [C]an establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b)(3).  This defense is sometimes referred to as the "innocent landowner defense." *Kerr-McGee Chemical Corp.*, 14 F. 3d 321, 325.

26

131.   To successfully assert the "innocent landowner defense," the defendant has the burden of proving by a preponderance of the evidence that (1) the actual or threatened release and damages were caused solely by a third party, (2) the third party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant, and (3) the defendant exercised due care with respect to the hazardous substances and took precautions against foreseeable acts or omissions of the responsible third party. *Am. Nat'l Bank and Trust Co.  v.  Harcros Chem., Inc.*, 997 F. Supp. 994, 1000-1001 (N.D. Ill. 1998).

132.   42 U.S.C. § 9613(g)(2) provides that in a CERCLA action for recovery of costs "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

133.   Under CERCLA, a plaintiff can obtain a declaratory judgment where it has incurred "some minimal level of expense associated with the alleged contamination, such as assessment or monitoring costs." *VME Americas, Inc.  v. Hein-Werner Corp.*, 946 F. Supp. 683, 694 (E.D. Wis. 1996).  A declaratory judgment "is an appropriate remedy under CERCLA where it is not yet possible to determine the actual cost of cleanup." *Bowen Eng'g v.  Estate of Reeve*, 799 F. Supp. 467, 476 (D. N.J. 1992).

134.   "Once liability is established under section 107(a) of CERCLA, section 113(g) of CERCLA requires entry of a declaratory judgment as to liability for future response costs." *Evansville Greenway and Remediation Trust  v.  S. Indiana Gas and Elec. Co., Inc.*, No. 3:07-cv-66-DFH-WGH, 2009 WL 3163180, at *19 (S.D. Ind. Sept. 29, 2009); *see Norfolk S. Ry. Co. v. Gee Co.*, No. 98 C 1619, 2002 WL 31163777, at *34 (N.D. Ill. Sept. 30, 2002) (noting that "if a defendant is found liable under CERCLA § 107, the court is required to grant a declaratory judgment in the plaintiff's favor").

## ELA

135.   The Indiana Environmental Legal Actions (ELA) statute is found at Ind. Code 13-30-9-1 through 13-30-9-8.  It provides an analogous "state law cause of action closely resembling the cost recovery provisions enumerated in CERCLA

27

Section 107." *Northstar Partners  v.  S & S Consultants, Inc.*, No. 1:03-cv-400-LJM-VSS, 2004 WL 963706, at *7 (S.D. Ind. March 31, 2004).

136.   The ELA provides that:

> [a] person may, regardless of whether the person caused or contributed to the release of a hazardous substance . . . into the surface or subsurface soil . . . that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action.

Ind. Code § 13-30-9-2.

137.   Under the ELA, parties responsible for creating the environmental contamination bear the financial burden of paying the costs of cleanup.  Ind. Code § 13-30-9-3; *Cooper Industrial, L.L.C. v. City of South Bend*, 899 N.E.2d 1274, 1284 (Ind. 2009).

138.   Under the ELA, "'caused or contributed' requires some involvement by the actor which produces a result," *City of Martinsville v.  Masterwear*, No. 1:04-cv-1994-RLY-WTL, 2006 WL 2710628, at *4 (S.D. Ind. Sept. 20, 2006), or that a party "'played a significant part' in the contamination or had 'some involvement' with the contaminants at issue."  Court's June 2, 2009 Order on City of Gary's Motion For Partial Summary Judgment in this case at 31; *City of Indianapolis v.  Ertel Manuf. Corp.*, Cause No. 49F12-0807-PL-033638, slip op. at 7, paragraph 25 (Marion Co. Sup. Ct. Aug. 20, 2009).

139.   Indiana law permits a court to issue a declaratory judgment regarding liability in an ELA case.  Ind. Code 34-14-1-2 (the general declaratory judgment statute).

# ANALYSIS

## CITY OF GARY'S CERCLA CLAIM (COMPLAINT)

140.    The Complaint filed by the City of Gary against Paul Shafer and

Paul's Auto Yard, Inc. alleges that the City of Gary has incurred, and will incur future, costs for environmental response and remediation due to lead contamination at the Paul's Auto Yard site and that under CERCLA Paul Shafer and Paul's Auto Yard, Inc. are responsible parties which disposed or released lead onto and into the soil at the Site.  It asks the Court for a declaratory judgment under CERCLA that Paul Shafer and Paul's Auto Yard, Inc. are liable for contribution toward payment of response and remediation costs.

## LACK OF SUFFICIENT PROOF OF LEAD CONTAMINATION RESULTING FROM VEHICLE BATTERIES

141.   The City of Gary argues that releases of lead occurred on the Paul's Auto Yard site from vehicle batteries brought onto, stored, or handled on, Sections 2 and 3.  The City of Gary argues that releases of lead on the Site by Paul's Auto Yard occurred from damaged batteries left in vehicles, damaged batteries removed from vehicles, and leakage from storage trailers or containers holding batteries.  It argues that the sole source of distributions and concentrations of lead across Sections 2 and 3 of the Site is lead from vehicle batteries at Paul's Auto Yard.

142.   However, immediately upon receiving a vehicle onto the Site, Paul's Auto Yard, routinely as a matter of course, removed the vehicle batteries from the vehicles that contained batteries when they were brought onto the Site. Three witnesses (Paul Shafer, Dennis Ingram, and Walter Eugene Sanders, Sr.) so testified.

143.   Vehicle batteries so salvaged were either placed in the business office for sale to customers or else were individually wrapped with Saran wrap and placed in a covered trailer lined with plastic to prevent any leakage until sold to businesses which purchased salvage batteries.

144.   Paul's Auto Yard did not place or store vehicle batteries on the ground.

145.   Paul's Auto Yard received a substantial number of salvage vehicles that had been in collisions, but 99% of these vehicles did not have any batteries in them when they arrived at Paul's Auto Yard.

29

146.   The City of Gary wrongly assumes that most, if not all, of the vehicles brought to Paul's Auto Yard contained batteries.  It grossly overestimates the number of vehicle batteries brought onto the Site.  Of all the vehicles brought to Paul's Auto Yard, only approximately 20% had batteries in them by the time they were brought to the Site.

147.   There is no evidence that Paul's Auto Yard ever kept or stored any vehicle batteries on Section 3 of the Site.

148.   The City of Gary's expert witness conceded that he does not know how many cracked vehicle batteries came onto the Paul's Auto Yard site or how many cracked batteries were required to cause the levels of lead contamination found at the Site.

149.   Two more probable explanations for lead contamination in Section 2 of the Paul's Auto Yard site are leakage from vehicle batteries during the time period that LeRoy Shafer owned and operated his business there, and run-off of lead-containing soil sediment, leachate, and rain water from the nearby Gary Landfill. A more likely explanation for lead contamination in Section 3 of the Paul's Auto Yard site is run-off of lead-containing soil sediment, leachate, and rain water from the nearby Gary Landfill.

150.   There is no direct evidence that Paul's Auto Yard caused or allowed any leakage from any vehicle batteries onto or into the soil at the Site. The City of Gary's evidence is solely circumstantial.  Circumstantial evidence alone may be sufficient to prove the City of Gary's allegations but it is unconvincing evidence here.  Its argument is that there is lead in the soil at the Site, Paul's Auto Yard operated a vehicle salvage business there, vehicles have batteries containing lead, so due to the large number of vehicles there must have been some leakage from batteries onto the soil.  This argument is based on assumptions and speculation – incorrect ones.

151.   The City of Gary has failed to prove by a preponderance of the evidence that Paul Shafer or Paul's Auto Yard, Inc. committed a disposal of a hazardous substance by leaking lead from vehicle batteries onto or into the soil at the Site.  Accordingly, its prayer for a declaratory judgment in this regard is denied.

## LEAD CONTAMINATION RESULTING FROM
## MOVEMENT OF SOIL BY PAUL'S AUTO YARD

152.   The City of Gary also argues that Paul's Auto Yard committed a "disposal" of lead contamination by moving lead-contaminated soil at the Site. It argues that Paul's Auto Yard graded and leveled soil at the Site, spreading lead contamination about.

153.   Paul Shafer or Paul's Auto Yard, Inc. caused a dirt road to be built across part of Section 3 of the Site as it developed Section 3 from a wooded and brushy area to an enlarged salvage vehicle area.  However, the record is devoid of any evidence that construction of the road resulted in the movement, spreading, or exacerbation of any contaminated soil.

154.   There was necessarily foot traffic by customers and employees on the Paul's Auto Yard site as part of its business operations.  However, the record is devoid of any evidence that foot traffic resulted in the movement, spreading, or exacerbation of any contaminated soil.

155.   When Paul Shafer sold the Site to Waste Management in December 1991, Paul's Auto Yard, Inc. had two more years within which to rid the Site of salvage vehicles, vehicle parts, tires, scrap metal, and the like. At that time, large piles of old tires existed.  Dirt, metal, and other objects were interspersed in the piles of tires.  In the process of removing the piles of tires, Paul's Auto Yard, Inc. disturbed the dirt, metal, and other objects to the extent necessary to scoop up and remove the tires.  During this process, Paul's Auto Yard, Inc. did not move dirt to another location on the Site, nor do any leveling or grading of dirt.  However, a relatively small amount of dirt was moved in the process.  It was left in "just about" the same location.

156.   Other than the moving of a relatively small amount of soil while scooping up and removing piles of tires, Paul's Auto Yard, Inc. caused no other movement of soil at the Site.

157.   The movement of environmentally contaminated soil constitutes a "disposal" for CERCLA purposes.

158.   Under CERCLA, "disposal" includes dispersion of a hazardous substance which exacerbates a pre-existing contamination on the property.  *See Alcan-Toyo Am., Inc.*, 881 F. Supp. 342, 346; *Ganton Tech.*, 834 F. Supp. 1018, 1021-1022 (citing *Kaiser Aluminum & Chemical Corp. v. Catellis Dev. Corp.*, 976 F.2d 1338 (9th Cir. 1992)).  "Disposal" is not limited to the initial introduction of contaminants into a site.  *Ganton*, 834 F. Supp. at 1022.  Rather, "whether a particular action constitutes a disposal can depend on the context of the entire situation . . ."  *Id.*; *Amcast Industrial Corp.*, 2 F.3d 746, 750.

159.   Whether or not Paul's Auto Yard, Inc. knew that the soil was environmentally contaminated when it caused the soil to be moved (dispersed) is irrelevant.  Liability under § 107(a) is strict – the innocence of the defendant is irrelevant.  *Harley-Davidson, Inc.*, 41 F.3d 341, 343.

160.   The amount or volume of soil moved (dispersed) is irrelevant.  There are no quantitative levels of hazardous substances required to trigger liability under CERCLA as the amount of concentration of a hazardous substance is irrelevant for CERCLA liability purposes.  *Illinois*, 104 F. Supp. 2d 967, 977.  "CERCLA, on its face, applies to 'any' hazardous substance, and it does not impose quantitative requirements."  *Id.*

161.   "The absence of such quantity requirements in CERCLA leads inevitably to the conclusion that Congress planned for the 'hazardous substance' definition to include even minimal amounts of pollution."  *Id.*

162.   The City of Gary introduced evidence that some areas at the Paul's Auto Yard site, at some unknown point in time, by some unknown person or persons, were filled in by excavation of soil and that many of these filled-in areas contained numerous fragments of tire rubber, metal, glass, wire, plastic, and other debris pieces consistent with auto salvage business operations as low as five feet below the surface of the ground, but the evidence does not sufficiently connect Paul Shafer or  Paul's Auto Yard, Inc. to causing this excavation.

163.   The Court may issue a declaratory judgment on liability in a CERCLA case even though no specific remedy has been chosen.  42 U.S.C. § 9613(g)(2); *Bowen Eng'g,* 779 F. Supp. at 476 (providing that a declaratory judgment "is an appropriate remedy under CERCLA where it is not yet possible to

32

determine the actual costs of the cleanup.").

164.   The City of Gary has proven by a preponderance of the evidence that Paul's Auto Yard, Inc. committed a disposal or release of a hazardous substance by moving (dispersing) a small amount of lead-contaminated soil at the Site.  The City of Gary has not proven that Paul Shafer, as an individual, did so.

165.   Accordingly, the Court hereby declares judgment on the issue of liability under CERCLA in favor of the City of Gary against Paul's Auto Yard, Inc. (not against Paul Shafer as an individual) based on Paul's Auto Yard, Inc.'s minimal movement of lead-contaminated soil when removing piles of tires; Paul's Auto Yard, Inc. shall be liable to pay proportional contribution toward the past and future costs of environmental cleanup of the Site, the proportions and amounts to later be determined.

## CITY OF GARY INCURRED RESPONSE COSTS
## AND WILL INCUR FUTURE COSTS

166.   The City of Gary is required to prove that it incurred response costs necessary and consistent with the NCP.  *Martinsville*, 2006 WL 2710628 at *2.  It may recover response costs associated with initial investigation and monitoring costs, irrespective of compliance with the NCP.  *Continental Title Co.*, 1999 WL 753933, at *3.  The City of Gary has proven by a preponderance of the evidence that it has incurred response costs related to the investigation of contamination at the Site, as well as assessment and government oversight costs. Further, it will incur future costs for cleanup of the contamination at the Site, although no specific remediation plan has yet been chosen.

## PAUL'S AUTO YARD'S INVOCATION OF THE
## INNOCENT LANDOWNER DEFENSE
## (ANSWER AS AFFIRMATIVE DEFENSE)

167.   Under CERCLA, at 42 U.S.C. § 9607(b), it is a defense if the release or threatened release of a hazardous substance was an act or omission of a third party (unless it occurred in connection with a contractual relationship with the defendant) if the defendant exercised due care concerning the hazardous substance and took precautions against foreseeable acts or omissions of the third party and

against the foreseeable consequences of the third party's acts or omissions.

168.     Paul Shafer and Paul's Auto Yard, Inc. invoke this defense and contend that they are not liable in this case because the City of Gary caused the environmental contamination at the Site, i.e., Paul's Auto Yard was an innocent landowner.  However, Paul Shafer, as an individual, was the owner of the land, not Paul's Auto Yard, Inc.

169.     To successfully assert this defense, Paul's Auto Yard must prove that (1) the actual or threatened release and damages were caused solely by the City of Gary, (2) the City of Gary did not cause the release in connection with a contractual, employment, or agency relationship with Paul's Auto Yard, and (3) Paul's Auto Yard exercised due care with respect to the hazardous substance and took precautions against foreseeable acts or omissions of the City of Gary.  *Am. Nat'l Bank and Trust Co.*, 997 F. Supp. at 1000-1001.  If Paul's Auto Yard is unable to prove each of these elements then the defense is unavailable to them.

170.     The City of Gary contends that because Paul's Auto Yard purchased the Site from the Estate of LeRoy Shafer, that real estate purchase transaction constitutes a contractual relationship under CERCLA.  However, Paul's Auto Yard does not invoke the innocent landowner defense by arguing that LeRoy Shafer is the third party who caused the release of lead contamination on the Site, but instead it argues that the City of Gary caused the release of lead contamination on the Site.  The proper inquiry is whether any such release was caused in connection with a contractual relationship between Paul Shafer or Paul's Auto Yard, Inc. and the City of Gary.

171.     Assuming that there was a contractual relationship between the City of Gary and Paul Shafer or Paul's Auto Yard, Inc., there must be a connection between the contractual relationship and the act or omission that resulted in the contamination on the Site.  *See Am. Nat'l Bank and Trust*, 997 F. Supp. at 1001. Paul's Auto Yard contends that run-off and bulldozing of soil from the Gary Landfill was the cause of lead contamination at the Site during Paul's Auto Yard's ownership of and operations on the Site, as well as during Waste Management's ownership of the Site.  To the extent that Paul's Auto Yard and the City of Gary may be indirectly involved in a once-removed contractual relationship (as a result

of Paul's Shafer's real estate sales contract with Waste Management when Waste Management purchased the Site and Waste Management's subsequent settlement agreement with the City of Gary, resulting in the City of Gary obtaining ownership of the Site) there is no evidence indicating that such relationship was connected to the City of Gary's alleged release of lead contamination onto the Site by run-off and bulldozing of soil.  Further, to the extent that such contamination occurred during Paul's Shafer's ownership of the Site (and Waste Management's ownership) there was no contractual relationship at that time between Paul's Auto Yard and the City of Gary.  Accordingly, Paul's Auto Yard has satisfied this element of the defense.

172.    Nonetheless, Paul's Auto Yard is unable to satisfy the remaining elements of the innocent landowner defense.  Given that the Court has ruled that the City of Gary has sufficiently proven that Paul's Auto Yard committed a "disposal" of lead-contaminated soil at the Site, albeit a minimal one, Paul's Auto Yard is necessarily unable to prove that the release or disposal of lead contamination at the Site was *solely* caused by the City of Gary.

173.    Next, in determining whether Paul's Auto Yard exercised due care and took appropriate precautions, to establish due care Paul's Auto Yard must prove that it took positive steps to reduce the threat posed by the hazardous substance.  *Kerr-McGee*, 14 F.3d at 325.  A party's failure to attempt to remove hazardous substances once the party is aware of them does not establish due care. *Id*.  While evidence presented at trial supports that Paul's Auto Yard took positive steps to reduce the threat posed by hazardous substances contained in vehicle batteries, Paul Shafer testified that he was aware of LeRoy Shafer's operations on the site which included draining various fluids from vehicles (including leaded gasoline) onto the ground and then setting the vehicles on fire.  Paul Shafer testified that he saw vehicle parts all over Section 2, as well as broken batteries and batteries placed directly on the ground.  Yet, after purchasing the Site from LeRoy Shafer's Estate, Paul Shafer made no attempt to test the Site for, or remove, hazardous substances resulting from LeRoy Shafer's operations on the Site.  Paul's Auto Yard has failed to prove that it exercised due care with regard to hazardous substances at the Site.  *See Am. Nat'l Bank and Trust*, 997 F. Supp. at 1002 (finding that the innocent landowner defense was not met where the party asserting the defense failed to attempt to ascertain the nature or degree of the threat posed by hazardous substances at the site or attempt to remove them or take other positive

steps to reduce the threat posed by the substances); *Kerr-McGee*, 14 F.3d at 325
(finding that a defendant failed to meet the requirements of the innocent landowner
defense where it was aware of hazardous wood preservatives at the site and made
no attempt to remove the substances).

174.   Accordingly, Paul Shafer and Paul's Auto Yard, Inc. have failed to
prove by a preponderance of the evidence the availability of the CERCLA innocent
landowner defense.

175.   Paul Shafer and Paul's Auto Yard, Inc.'s other affirmative defenses
asserted in their Answer are denied for lack of sufficient proof.

## CITY OF GARY'S ELA CLAIM (COMPLAINT)

176.   The Complaint filed by the City of Gary against Paul Shafer and
Paul's Auto Yard, Inc. also alleges that under the Indiana Environmental Legal
Actions statute (ELA), they are responsible parties which disposed of or released
lead contamination onto and into the soil at the Site. The City of Gary asks for a
declaratory judgment under the ELA that Paul Shafer and Paul's Auto Yard, Inc.
be liable for contribution toward payment of response and remediation costs.

177.   The Indiana ELA provides that:

> A person may, regardless of whether the person caused or contributed
> to the release of a hazardous substance . . . into the surface or
> subsurface of the soil. . . that poses a risk to human health and the
> environment, bring an environmental legal action against a person
> that caused or contributed to the release to recover reasonable costs
> of a removal or remedial action involving the hazardous substance[].
> . . .

Ind. Code § 13-30-9-2.  A city may pursue a claim under the Indiana ELA.  *Cooper
Indus., L.L.C.*, 899 N.E.2d at 1284.  Under this statute, "caused or contributed"
requires some involvement by the actor which produces a result.  *City of
Martinsville*, 2006 WL 2710628, at *4.

178.   As discussed above in paragraphs 152 – 165, the City of Gary has

proven by a preponderance of the evidence that Paul's Auto Yard, Inc. committed a disposal of a hazardous substance by moving (dispersing) a small amount of lead-contaminated soil at the Site.  Accordingly, the Court hereby declares judgment on the issue of liability under the Indiana ELA in favor of the City of Gary against Paul's Auto Yard, Inc. (not against Paul Shafer as an individual)  based on Paul's Auto Yard, Inc.'s minimal movement of lead-contaminated soil when removing piles of tires; Paul's Auto Yard, Inc. shall be liable to pay proportional contribution toward the past and future costs of environmental cleanup of the Site, the proportions and amounts to later be determined.

## PAUL'S AUTO YARD'S CERCLA CLAIM (COUNTERCLAIM)

179.    The Counterclaim filed by Paul Shafer and Paul's Auto Yard, Inc. against the City of Gary alleges that under CERCLA the City of Gary is responsible for release or disposal of lead contamination onto and into the soil at the Paul's Auto Yard site and pursuant to 42 U.S.C. § 9613(f) they request that the Court order the City of Gary to pay contribution toward the costs of response and remediation if they are found to be liable in this case.

180.    To establish a § 113(f) contribution claim under CERCLA, Paul's Auto Yard must satisfy the same requirements as in a § 107(a) claim, namely, that:

(A)    the site in question is a facility,

(B)    a release or threatened release of a hazardous substance has occurred,

(C)    the release or threatened release has caused response costs to be incurred, and

(D)    the City of Gary is a responsible party.

*Environmental Transp. Sys., Inc.  v.  ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992);  *See RSR Corp. v. Avanti Development, Inc.*, No. IP95-1359-C-M/S, 2000 WL 1449858, at *4 (S.D. Ind. March 31, 2000) (providing that the same elements for a § 107(a) claim "form the basis for a claim under § 113")*;  Amer. Nat. Bank and Trust Co. of Chicago as Trustee for Illinois Land Trust No. 120658-01 v. Harcros Chems., Inc.*, No. 95 C 3750, 1997 WL 281295, at *7 (N.D. Ill. May 20,

1997) (providing that to establish that a party is liable under § 113(f), the party bringing the contribution claim must first prove that the other party is liable under CERCLA § 107(a)); *See also Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 163 (2d Cir. 1999) (providing that "[t]he elements of an action under § 113(f)(1) are the same as those under § 107(a).").

181.   The Court here incorporates by reference its findings of fact in paragraphs 91 through 111 above and its conclusions of law in paragraphs 112 through 134 above.

182.   The Paul's Auto Yard site (Sections 2 and 3) is a "facility" as that term is defined at 42 U.S.C. § 9601(9) and for purposes of 42 U.S.C. § 9607(a) liability (stipulated by the parties in the Second Amended Pre-Trial Order).

183.   The City of Gary is a responsible party under CERCLA which disposed or released a hazardous substance (lead contamination) at a facility (the former Paul's Auto Yard site) which will cause response costs to be incurred in the future (costs of remediation).

184.   Paul Shafer and Paul's Auto Yard, Inc. have proven by a preponderance of the evidence that the City of Gary committed a disposal or release of a hazardous substance onto and into the soil at the former Paul's Auto Yard site by allowing, over a time period of several decades, soil sediment, leachate, and water run-off, all containing lead contamination, to frequently run off from the Gary Landfill and wash over onto the Paul's Auto Yard site as a result of any heavy rain, causing lead to settle into the soil at the Site.

185.   Although CERCLA and case law in the Seventh Circuit do not specifically define what it means for a party to "incur" response costs, one court addressing the issue provided that the term "incur" in this context is not limited to incurring liability, but rather, "the term should include the requirement that a Responsible Party has *or will* actually incur the specific cost for which it seeks contribution." *Basic Management, Inc. v. U.S.*, 569 F. Supp. 2d 1106, 1120 (D. Nev. 2008) (emphasis added).

186.   Although Paul Shafer and Paul's Auto Yard, Inc. allege in their Counterclaim that they have incurred response costs as a result of the City of

38

Gary's release of lead contamination on the Site, there is no evidence that Paul Shafer or Paul's Auto Yard, Inc. has incurred any response cost to date.[5] However, Paul's Auto Yard, Inc. will incur future response costs due to this Court's declaratory judgment against it in paragraph 165 above declaring that Paul's Auto Yard, Inc. must pay proportional contribution toward the past and future costs of environmental cleanup at the Site.

187.   A court is required to issue a declaratory judgment in a plaintiff's favor where a defendant is found liable under CERCLA § 107(a).  But in actions brought under § 113(f), the court has discretion to issue a declaratory judgment. *Norfolk S. Railway Co.*, 2002 WL 31163777, at *34.  "[N]othing in CERCLA prevents the issuance of declaratory relief in a contribution action, and in fact the policies underlying CERCLA support such relief."  *Appleton Papers, Inc. v. George A. Whiting Paper Co.*, 572 F.Supp.2d 1034, 1046 (E.D. Wis. 2008).

188.   The Court has the authority to issue a declaratory judgment in a CERCLA contribution action pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act.  *U.S. v. Davis*, 31 F.Supp.2d 45, 59 (D. R.I. 1998).  "[A] party seeking declaratory judgment establishing liability for contribution in the context of CERCLA must demonstrate the existence of an actual case or controversy." *Reichhold, Inc. v. U.S. Metals Refining Co.*, 522 F.Supp.2d 724, 728 (D. N.J. 2007). Here, "the apportionment of liability among the litigants presents a real and substantial controversy between parties having adverse interests that satisfies the requirements of the Declaratory Judgment Act."  *Davis*, 31 F.Supp.2d at 59.

189.   Although Paul Shafer and Paul's Auto Yard, Inc.'s Counterclaim against the City of Gary does not specifically request relief in the form of a declaratory judgment, it asks the Court, if they are found liable on the City of Gary's § 107(a) claim, to award them "contribution from the City according to its proportionate share of liability pursuant to Section 113(f) of CERCLA." Counterclaim at p. 4.  "Notice pleading does not require any magic words to describe the relief sought."  *Davis*, 31 F.Supp.2d at 60.  "CERCLA does not

---

[5] To the extent that Paul Shafer and Paul's Auto Yard, Inc. seek contribution for attorney's fees that they have incurred, they may not recover such fees "incurred in connection with bringing a contribution suit against other PRP's . . ."  *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 767  n.10 (7th Cir. 1994).

require any heightened pleading requirements." *City of Waukegan, Ill. v. National Gypsum Co.*, 587 F.Supp.2d 997, 1003 (N.D. Ill. 2008). "It is sufficient that the [Counterclaim] fairly apprises the [City of Gary] of the claim being made." *Davis*, 31 F.Supp.2d at 60. Paul Shafer's and Paul's Auto Yard, Inc.'s Counterclaim requests an order for contribution based on a judicial determination of liability on the § 107(a) claim and each party's "proportionate share of liability," thereby sufficiently apprising the City of Gary of the claim being made.

190.    Accordingly, the Court hereby declares judgment on the issue of liability under CERCLA in favor of Paul's Auto Yard, Inc.(not Paul Shafer as an individual) against the City of Gary, based on the lead-contaminated soil sediment, leachate, and water run-off from the Gary Landfill; the City of Gary shall be liable to pay contribution toward the past and future costs of environmental cleanup of the Site, the proportions and amounts to later be determined. The declaratory judgment requested in the Counterclaim by Paul Shafer as an individual is denied.

## PAUL'S AUTO YARD'S ELA CLAIM (COUNTERCLAIM)

191.    The Counterclaim filed by Paul Shafer and Paul's Auto Yard, Inc. against the City of Gary alleges that under the Indiana ELA the City of Gary is responsible for release or disposal of lead contamination onto and into the soil at the Paul's Auto Yard site and it requests that the Court order the City of Gary to pay contribution toward the costs of response and remediation if Paul Shafer or Paul's Auto Yard, Inc. is found to be liable in this case.

192.    The Court here incorporates by reference its findings of fact in paragraphs 91 through 111 above, its conclusions of law in paragraphs 112 through 134 above, and paragraph 184 above.

193.    Accordingly, the court hereby declares judgment on the issue of liability under the Indiana ELA in favor of Paul's Auto Yard, Inc. (not Paul Shafer as an individual) against the City of Gary, based on the lead-contaminated soil sediment, leachate, and water run-off from the Gary Landfill; the City of Gary shall be liable to pay contribution toward the past and future costs of environmental cleanup of the Site, the proportions and amounts to later be determined. The declaratory judgment requested in the Counterclaim by Paul Shafer as an

individual is denied.

## PAUL'S AUTO YARD'S CERCLA AND ELA CLAIMS
## AGAINST WASTE MANAGEMENT (THIRD-PARTY COMPLAINT)

194.    The Third-Party Complaint filed by Paul Shafer and Paul's Auto Yard Inc. against Waste Management alleges that under both CERCLA and the Indiana ELA, Waste Management is responsible for release or disposal of lead contamination onto and into the soil at the former Paul's Auto Yard site (later the Waste Management site) and it requests that the Court order Waste Management to pay contribution toward the costs of response and remediation if they are found to be liable in this case.

195.   In December 1991 Paul Shafer sold the Site (Sections 2 and 3) to Waste Management.  By their agreement, Paul's Auto Yard, Inc. had two years, until approximately late 1993, within which to rid the Site of salvage vehicles, vehicle parts, tires, scrap metal, and the like.

196.   Waste Management owned the Site from December 1991 until approximately 1998 and it possessed the Site from approximately 1993 until approximately 1998.

197.   Waste Management did not conduct any regular or on-going business at the Site.  It assisted the City of Gary with removal of things improperly dumped at the Site such as couches, stoves, shingles, bags of garbage, and other debris. While doing this, sometimes Waste Management picked up dirt with the objects and thereby moved the dirt to some unknown extent.

198.   In addition, Waste Management graded soil at both Sections 2 and 3 with a grader or loader, moving dirt at the Site.  It did so weekly for an unspecified period of time.

199.   The movement of environmentally contaminated soil constitutes a "disposal" for CERCLA purposes.

200.   Under CERCLA, "disposal" includes dispersion of hazardous substances which exacerbates a pre-existing contamination on the property.  *See*

*Alcan-Toyo Am., Inc.,* 881 F. Supp. 342, 346; *Ganton Tech., Inc.*, 834 F. Supp. 1018, 1021-1022 (citing *Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338 (9th Cir. 1992)).  However, "disposal" is not limited to the initial introduction of contaminants into a site.  *Ganton*, 834 F. Supp. at 1022. Rather, "whether a particular action constitutes a disposal can depend on the context of the entire situation . . ." *Id.*; *Amcast Industrial Corp.*, 2 F.3d 746, 750.

201.   Whether or not Waste Management knew that the soil was environmentally contaminated when it caused the soil to be moved (dispersed) is irrelevant.  Liability under § 107(a) is strict – the innocence of the defendant is irrelevant.  *Harley-Davidson, Inc.*, 41 F.3d 341, 343.

202.   The amount or volume of soil moved (dispersed) is irrelevant.  There are no quantitative levels of hazardous substances required to trigger liability under CERCLA as the amount of concentration of a hazardous substance is irrelevant for CERCLA liability purposes.  *Illinois*, 104 F. Supp 2d 967, 977.  "CERCLA, on its face, applies to 'any' hazardous substance, and it does not impose quantitative requirements." *Id.*  "The absence of such quantity requirements in CERCLA leads inevitably to the conclusion that Congress planned for the 'hazardous substance' definition to include even minimal amounts of pollution." *Id.*

203.    Paul Shafer and Paul's Auto Yard, Inc. have proven by a preponderance of the evidence that Waste Management committed a disposal or release of a hazardous substance by moving (dispersing) lead-contaminated soil at the Site by grading the soil.

204.   Waste Management's affirmative defenses asserted in its Answer to the Third-Party Complaint are denied for lack of sufficient proof.

205.   Accordingly, the court hereby declares judgment on the issue of liability under both CERCLA and the Indiana ELA in favor of Paul's Auto Yard, Inc. (not Paul Shafer as an individual) against Waste Management, based on Waste Management's movement of lead-contaminated soil; Waste Management shall be liable to pay contribution toward the past and future costs of environmental cleanup of the Site, the proportions and amounts to later be determined.  The declaratory judgment requested in the Third-Party Complaint by Paul Shafer as an individual is denied.

## REMAINING ISSUES

206.   By agreement of the parties, the trial of this case was bifurcated so that the November 2, 3, 4, and 5, 2009 trial proceeding was only on the liability issues.

207.   The issues of allocation of proportionate shares of liability and response costs, awards of attorney fees, if any, and awards of costs, if any, remain unresolved.[6]  These issues will be set for Bench Trial proceedings in a separate notice to be issued.

## CONCLUSION

208.   The Court hereby **ORDERS** entry of declaratory judgment on the Complaint in favor Plaintiff the City of Gary, Indiana against Defendant Paul's Auto Yard, Inc.  The Court hereby **ORDERS** judgment on the Complaint in favor of Defendant Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard and against Plaintiff the City of Gary, Indiana.

209.   The Court hereby **ORDERS** entry of declaratory judgment on the Counterclaim in favor of Defendant Paul's Auto Yard, Inc. against Plaintiff the City of Gary, Indiana.  The Court hereby **ORDERS** judgment on the Counterclaim in favor of the City of Gary, Indiana against Defendant Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard.

210.   The Court hereby **ORDERS** entry of declaratory judgment on the Third-Party Complaint in favor of Third-Party Plaintiff Paul's Auto Yard, Inc. against Third-Party Defendant Waste Management Systems n/k/a Waste Management of Indiana, L.L.C.   The Court hereby **ORDERS** judgment on the Third-Party Complaint in favor of Third-Party Defendant Waste Management Systems n/k/a Waste Management of Indiana, L.L.C. against Third-Party Plaintiff

---

[6] To the extent that either party seeks to recover response costs incurred to date, such costs "do not include expenses incurred solely in preparation for litigation unless they significantly benefitted the entire cleanup effort and served a statutory purpose apart from the reallocation of costs."  *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2nd Cir. 2000) (quoting *Key Tronic Corp. v. U.S.*, 511 U.S. 809, 820 (1994)).

Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard.

211.   The City of Gary, Indiana, Paul's Auto Yard, Inc., and Waste Management Systems n/k/a Waste Management of Indiana, L.L.C. **SHALL** each pay contribution toward the past and future costs of environmental cleanup of the Site.  Paul Shafer as an individual proprietor d/b/a Paul's Auto Yard shall not be required to pay contribution.  The issues of allocation of proportionate shares of liability and response costs remain to be determined at a later date.

So ORDERED this 10th day of February, 2010.

/s/ Paul R. Cherry
Hon. Paul R. Cherry
Magistrate Judge
United States District Court
Northern District of Indiana

cc:    Michael O. Nelson, Jennifer C. Baker, and Leah B. Silverthorn, Attorneys for Plaintiff City of Gary, Indiana and Third-Party Defendant Waste Management Systems n/k/a Waste Management of Indiana, L.L.C.

Michael J. Maher, Jody E. Kahn, and John P. Arranz, Attorneys for Defendants and Third-Party Plaintiffs Paul Shafer d/b/a Paul's Auto Yard and Paul's Auto Yard, Inc.